16 F.3d 1142
 62 USLW 2599
 Martha RODASH, Plaintiff-Counter-Defendant-Appellant,
v.
AIB MORTGAGE COMPANY, Defendant-Appellee,
Empire of America Realty Credit Corporation,
Defendant-Counter-Claimant-Appellee.
 No. 93-4125.
 United States Court of Appeals,
Eleventh Circuit.
 March 21, 1994.
 
 Charles M. Baird, Legal Services of Greater Miami, Inc., Miami, FL, for appellant.
 R. Hugh Lumpkin, Michael B. Berger, Keith, Mack, Lewis, Cohen & Lumpkin, Miami, FL, for appellees.
 Appeal from the United States District Court for the Southern District of Florida.
 Before CARNES, Circuit Judge, FAY* and JOHNSON, Senior Circuit Judges.
 JOHNSON, Senior Circuit Judge:
 
 
 1
 The appellant, Martha Rodash, appeals the district court's denial of her motion for summary judgment regarding violations of the federal Truth in Lending Act ("TILA") and its grant of the appellees' cross-motion for summary judgment. Because we conclude that TILA was violated, we hold that the district court's orders were erroneous as a matter of law. We therefore reverse the district court.
 
 I. STATEMENT OF THE CASE
 A. Factual Background
 
 2
 The material facts in this case are not disputed. On January 18, 1991, Rodash obtained a home equity mortgage on her principal residence with appellee AIB Mortgage Company ("AIB") to pay for medical treatment for her multiple sclerosis. Rodash executed (1) a Promissory Note in favor of AIB evidencing an obligation to repay $102,000 and (2) a mortgage securing repayment of the Note to AIB. Later that day, AIB assigned its interest to appellee Empire of America Realty Credit Corporation ("Empire"). At the loan closing, the appellees gave Rodash the following four documents: (1) a federal Truth-in-Lending Disclosure Statement, (2) a Mortgage Settlement Statement, (3) a Notice of Right to Cancel, which stated that Rodash had three days to rescind the mortgage, and (4) an Acknowledgment of Receipt of Notice of Right to Cancel and Election Not to Cancel. The Settlement Statement reflected itemized charges of $22 for Federal Express delivery, $204 for intangible Florida taxes, and $6 for assignment of the mortgage. These charges were itemized under the "amount financed" in the transaction. Rodash signed the Election Not to Cancel on January 18, 1991, and the loan proceeds were distributed sometime after January 23, 1991. Rodash stopped making her mortgage payments as of July 1, 1991, and on December 26, 1991, Rodash's counsel wrote the appellees, stating she was rescinding the transaction under TILA and seeking cancellation of the security interest therein. Empire accelerated the balance due under the Note and filed a foreclosure action in state court.
 
 B. Procedural History
 
 3
 On February 13, 1992, Rodash filed an action against the appellees under TILA, 15 U.S.C.A. Secs. 1601-1641 (West 1982 & Supp.1993), and the Act's accompanying regulation, Regulation Z, 12 C.F.R. Sec. 226 (1993), seeking rescission of the transaction and statutory penalties. In April 1992, the district court denied the appellees' motions to dismiss the case or, in the alternative, for a stay pending the outcome of the state court foreclosure action. That same April, Rodash moved for summary judgment. The appellees jointly cross-motioned for summary judgment in June 1992. In December 1992, the district court entered an order of final summary judgment in favor of the appellees and against Rodash, holding that TILA had not been violated and that, as a matter of law, Rodash was not entitled to relief thereunder.
 
 C. Standard of Review
 
 4
 This Court reviews de novo a district court's disposition of summary judgment motions. Ordway v. United States, 908 F.2d 890, 893 (11th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2916, 115 L.Ed.2d 1080 (1991). We "must determine whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law. All evidence and reasonable factual inferences drawn therefrom are reviewed in the light most favorable to the party opposed to the motion." Warren v. Crawford, 927 F.2d 559, 561-62 (11th Cir.1991). See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (setting out summary judgment standard). We review de novo a district court's interpretation and application of a statute. Williams v. Homestake Mortgage Co., 968 F.2d 1137, 1139 (11th Cir.1992).
 
 II. ANALYSIS
 
 5
 According to Rodash, the district court erred by finding that (1) the appellees provided clear and conspicuous disclosure of her right to rescind the transaction and (2) the appellees did not understate the finance charge. After setting out general principles, we address each of these contentions in turn.
 
 A. General Principles
 
 6
 Congress designed TILA to promote the informed use and awareness of the cost of credit by consumers. Shroder v. Suburban Coastal Corp., 729 F.2d 1371, 1380 (11th Cir.1984). The Act ensures a meaningful disclosure of credit terms to enable consumers to compare readily the various credit terms available in the marketplace. Id. Congress intended the statute to create a system of private attorneys general to aid its enforcement; thus, to further its remedial purpose, we liberally construe its language in favor of the consumer. McGowan v. King, Inc., 569 F.2d 845, 848 (5th Cir.1978).[1] Accord Smith v. Fidelity Consumer Discount Co., 898 F.2d 896, 898 (3rd Cir.1990). Additionally, creditors must strictly comply with TILA's requirements. Shroder, 729 F.2d at 1380 (The creditor's disclosures must be in "the proper technical form and in the proper locations on the contract, as mandated by the requirements of TILA and Regulation Z. Liability will flow from even minute deviations from requirements."). Moreover, the consumer may sue for enforcement even if she is not actually deceived or harmed. Zamarippa v. Cy's Car Sales, 674 F.2d 877, 879 (11th Cir.1982) ("An objective standard is used to determine violations of the TILA, based on the representations contained in the relevant disclosure documents; it is unnecessary to inquire as to the subjective deception or misunderstanding of particular consumers.").
 
 B. Rodash's Rescission of the Transaction
 
 7
 On the closing date of January 18, 1991, the appellees provided Rodash the Notice of the Right to Cancel. On a separate, single sheet of paper, the appellees provided an acknowledgment that the Notice of Right to Cancel was received and provided an Election Not to Cancel, a pre-printed waiver of that right.[2] Beneath the waiver provision, Rodash signed the sole signature line on the paper. The appellees maintain that by signing this document Rodash waived her right to rescind the contract. Rodash, who rescinded the agreement in December 1991, contends that Empire's provision of the Election Not to Cancel on January 18 violated TILA because she had an unqualified right to rescind the transaction within three business days. Rodash also contends that the appellees violated TILA because they did not clearly disclose her right to rescind as required by the Act.
 
 
 8
 As part of TILA, Congress provided the consumer with the right to rescind a credit transaction by notifying the creditor within set time limits of the consumer's intent to rescind.[3] Williams, 968 F.2d at 1139. See 12 C.F.R. Sec. 226.23(a) (restating consumer's right of rescission). TILA specifically permits a consumer borrower to rescind a loan transaction that results in the creditor taking a security interest in the consumer's principal dwelling. In re Porter, 961 F.2d 1066, 1073 (3d Cir.1992); see 15 U.S.C.A. Sec. 1635(a). The consumer has an absolute right to rescind the agreement for three business days following the closing of the transaction. 15 U.S.C.A. Sec. 1635(a); 12 C.F.R. Sec. 226.23(a)(3). In addition, the consumer's ability to rescind an agreement may be extended for up to three years if the creditor fails to make all material disclosures to the borrower, including disclosure of the right to rescind. 12 C.F.R. Sec. 226.23(a)(3).
 
 
 9
 The purpose of the three-day waiting period is "to give the consumer the opportunity to reconsider any transaction which would have the serious consequence of encumbering the title to his [or her] home." S.Rep. No. 368, 96th Cong., 2d Sess. 28 (1980), reprinted in 1980 U.S.C.C.A.N. 236, 264. Thus, the sole instance in which the statute and its implementing regulations allow the consumer to waive her right to rescind within three days is where the consumer believes that a bona fide emergency necessitates an immediate extension of credit, in which case the consumer must sign a dated, handwritten statement that describes the emergency. 12 C.F.R. Sec. 226.23(e). Printed forms may not be used for this purpose. Id. Here, the appellees attempted to modify the rescission by having Rodash sign a pre-printed waiver of her right to rescind. This is prohibited. See id. Hence, we find the putative waiver to be invalid. Accordingly, our inquiry is whether the appellees' Notice of Right to Cancel is deficient, as Rodash's attempt to rescind came after the three-day cancellation period following the transaction but before three years had passed.[4]
 
 
 10
 Under the Act, the creditor must "clearly and conspicuously disclose" the consumer's right to rescind the transaction. 15 U.S.C.A. Sec. 1635(a); see 12 C.F.R. Sec. 226.23(b)(2) ("Notice [of right to rescind] shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose ... [t]he consumer's right to rescind the transaction."). To determine whether the notice given Rodash was confusing or misleading, this Court must scrutinize the circumstances of the transaction. See In re Porter, 961 F.2d at 1076 (determination of clear and conspicuous notice of rescission rights under TILA is intensely fact-based). As noted supra, the creditor's subjective intent is irrelevant to this determination; rather, notice of the right to rescind must be objectively conspicuous and apparent. Zamarippa, 674 F.2d at 879. The issue, then, is whether the appellees' provision of the Election Not to Rescind on January 18, 1991 prevented clear and conspicuous notice of Rodash's right to rescind within three days. We hold that it did. It is without question that this boilerplate provision precluded clear and conspicuous disclosure to Rodash that she had the right to rescind the agreement within three days of entering the mortgage purchase. Rather, it is far more likely that the primary effect of the appellees' providing Rodash the Election Not to Cancel at the closing was to confuse Rodash about her right.
 
 
 11
 Several considerations compel this conclusion. First, the appellees' proffering of the Election Not to Cancel during the transaction would confuse any reasonable borrower because it implies, incorrectly, that waiver is generally possible within the three-day cooling off period. Indeed, the presentation of the waiver form on the day of the transaction contradicted the very purpose of the cooling off period: to give the consumer time to consider the terms of her financial commitments. Second, by having Rodash sign a certificate of non-rescission on the date of the transaction, the appellees suggested that she had foreclosed her right of rescission. Thus, if Rodash had changed her mind the next day and wished to rescind the transaction, it would have been reasonable for her not to have exercised that right as a direct result of the improper furnishing of the Election Not to Cancel. Third, the appellees' practice of placing the acknowledgement and the waiver on the same page--indeed, in the same boilerplate paragraph--is confusing because an objective borrower may not understand what she is signing. Finally, we find that the appellees' practice of handing the consumer a waiver form the same day as the mortgage and Note is a misleading one, as the consumer, here Rodash, could reasonably think that she had to sign that form--as she must sign other forms--to consummate the mortgage transaction.[5]
 
 
 12
 Considered together, the Notice of Right to Cancel and the Election Not to Cancel do not constitute a "clear and conspicuous" disclosure of the three-day right to rescission under TILA. The Notice announces that there are three business days to rescind, but it is accompanied by the Election announcing in boilerplate that rescission has been declined at the outset such that no rescission period exists. These contradictory documents preclude the possibility of "clear" disclosure. Accordingly, the appellee violated TILA, and the district court erred as a matter of law by denying Rodash's summary judgment motion and granting the appellees' motion. On this ground alone, we reverse the district court. Nonetheless, in part III.C, we also reverse the district court on the ground that the appellees violated TILA by understating the finance charge.
 
 
 13
 C. The Appellees' Nondisclosure of All Finance Fees
 
 
 14
 Rodash contends that the appellees did not make all required material disclosures because they included the Federal Express charge of $22 and the intangible state tax of $204 in the "amount financed" instead of the "finance charge."[6] Rodash asserts that AIB understated the finance charge by omitting these two charges and thus violated the Act. We agree.
 
 
 15
 TILA requires the lender to disclose to the borrower, among other things, the "amount financed" and the "finance charge." 15 U.S.C.A. Sec. 1638. In transactions such as this one, the "amount financed" and the "finance charge" are mutually exclusive and together constitute the "total of payments". Sec. 1638(a)(5). The Act defines "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." Id. Sec. 1605(a).[7] The Act then illustrates examples of finance charges. Id. TILA and Regulation Z also provide examples of exclusions from the finance charge. See 15 U.S.C.A. Sec. 1605(d) & (e); 12 C.F.R. Secs. 226.4(c)(7) & (e). Moreover, the definition of "finance charge" includes charges imposed on the consumer by someone other than the creditor for services required by the creditor even if the creditor does not retain the charges. See Johnson v. Fleet Finance, 4 F.3d 946, 949 (11th Cir.1993) (per curiam) (non-required broker's fees are not included in finance charge); First Acadiana Bank v. Federal Deposit Ins. Corp., 833 F.2d 548, 550-51 (5th Cir.1987) (required lawyer's fees should be included in finance charge). Congress strictly requires creditors to disclose all finance charges to prohibit creditors from circumventing TILA's objectives and burying the cost of credit in the price of goods sold. Mourning v. Family Publications Serv., 411 U.S. 356, 366, 93 S.Ct. 1652, 1658, 36 L.Ed.2d 318 (1973).
 
 1. $22 Federal Express Charge
 
 16
 AIB incurred $22 in Federal Express charges during the transaction, treating this cost within the amount financed rather than within the finance charge. AIB incurred this charge to pay off Rodash's then-existing mortgage held by another creditor named Centrust and to return the original loan documents to Empire. Only those charges payable by the consumer "directly or indirectly by the creditor as an incident to ... the extension of credit" fall within the general definition of finance charge. 15 U.S.C.A. Sec. 1605(a); see also 12 C.F.R. Sec. 226.4(a). We hold that, under the Act's definition, the Federal Express fee is undoubtedly part of the finance charge. "Finance charges" include "[s]ervice, transaction, activity, and carrying charges". 12 C.F.R. Sec. 226.4(b)(2). Here, the complete transaction included the appellees' providing a home equity loan. Part-and-parcel of the fulfillment of the transaction was AIB's paying off the consumer's previous mortgage by delivery of a check to Centrust. Thus, the Federal Express fee can be viewed as a "transaction charge"--without mailing the check to Centrust, the home equity transaction would not have been consummated.
 
 
 17
 In addition, the finance charge also includes "[c]harges imposed on a creditor by another person for purchasing or accepting a consumer's obligation". 12 C.F.R. Sec. 226.4(b)(6). We view the Federal Express fee as just such a charge. The consumer was obligated to pay Centrust for an existing loan. The appellees accepted the consumer's obligation. In accepting the payment from the appellees, Centrust imposed the burden--in other words, the cost--of transporting the check to AIB, who had the option of selecting the method of transportation. Rodash then paid this cost to the appellees incident to receiving credit. Accordingly, we hold that the Federal Express fee constituted a finance charge that was improperly included in the amount financed because the Federal Express charge was "imposed directly or indirectly by the creditor as an incident to the extension of credit."[8]
 
 
 18
 Our conclusion is buttressed by public policy. The purpose of TILA is to make various credit terms available to consumers, so they can more easily compare such terms between banks and other financial institutions. Consequently, financial institutions may not bury any costs of credit as such indirection would hinder consumers in comparing credit terms and making the best informed decision on the use of credit. Cf. Mourning, 411 U.S. at 377, 93 S.Ct. at 1664 ("Some may claim that it is a relatively easy matter to calculate the total payments to which petitioner was committed by her contract with respondent; but at the time of sale, such computations are often not encouraged ... or performed."). Consequently, the appellees violated TILA as a matter of law by failing to disclose as part of the finance charge the charge imposed upon Rodash for payment of the Federal Express delivery.
 
 2. Intangible Tax
 
 19
 Rodash paid the appellees a $204 Florida intangible tax on the Note securing the loan.[9] AIB included this tax in the amount financed rather than the finance charge. Because the intangible tax is a charge payable by the consumer "directly or indirectly ... as an incident to the extension of credit," it is a finance charge, unless it falls within an exclusion. Given that state intangible taxes are not specifically excluded, the only potentially relevant exclusions are as follows:
 
 
 20
 (1) "A tax imposed by a state ... on the credit transaction that is payable by the consumer (even if the tax is collected by the creditor)" when the charge is imposed on the consumer by someone other than the creditor. F.R.B. Commentary on 12 C.F.R. Sec. 226.4(a), Comment 3, reprinted in 12 C.F.R. pt. 226, Supp. I;
 
 
 21
 (2) "[c]harges for filing or recording security agreements, mortgages, ... and similar documents." F.R.B. Commentary on 12 C.F.R. Sec. 226.4(e), Comment 12, reprinted in 12 C.F.R. Pt. 226, Supp. I; and
 
 
 22
 (3) "[t]axes and fees prescribed by law that actually are or will be paid to public officials for ... perfecting ... a security interest." 12 C.F.R. Sec. 226.4(e)(1).
 
 
 23
 We hold that the Florida tax should have been included in the finance charge because it was a charge paid by the consumer directly for the extension of credit and no exclusion applies. First, the plain language of TILA evinces no explicit exclusion of an intangible tax from the finance charge. Second, the intangible tax does not fall under the first listed exclusion because it is imposed on the creditor--not the consumer--for holding the Note, an intangible asset. See Fla.Stat.Ann. Sec. 199.135(1) (West 1989) (nonrecurring tax is imposed on person recording note); First Nat'l Bank v. Department of Revenue, 364 So.2d 38, 39 (Fla.Dist.Ct.App.1978) (noting that intangible property tax is assessed against creditor), appeal dismissed, 368 So.2d 1366 (Fla.1979) (Table, No. 55880).[10] Third, contrary to the appellees' contention, the intangible tax does not fall under the second exclusion because it is not a recording fee; rather, recording fees are imposed under a wholly different statute. See Fla.Stat.Ann. Sec. 28.24 (West 1988) (setting charge for recording fees). Finally, the purpose of the tax is most likely revenue enhancement, not perfection of a security interest, which concerns the proper recordation of the instrument, and therefore the third exclusion is equally inapplicable. Thus, the Florida intangible tax was improperly excluded from the TILA finance charge, and Rodash had the legal right to rescind the transaction in December 1991.[11]
 
 III. CONCLUSION
 
 24
 The Truth in Lending Act, now a quarter of a century old, manifested a change in federal policy from a philosophy of "Let the buyer beware" to one of "Let the seller disclose." Mourning, 411 U.S. at 377, 93 S.Ct. at 1664. The burdens imposed on creditors are minimal, especially when compared to the harms that are avoided. The appellees' actions in this case disregarded that policy. Consequently, the district court erred as a matter of law in holding that TILA had not been violated and granting the appellees' cross-motion for summary judgment. The court also erred as a matter of law in denying Rodash's motion for summary judgment. The court's orders must be, and are, therefore, REVERSED, and the case is REMANDED for a disposition consistent with this decision. On remand, we instruct the district court to consider the issue of statutory damages.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 Decisions of the former Fifth Circuit issued before October 1, 1981 are binding as precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc)
 
 
 [2]
 The sheet of paper read in its entirety:
 The undersigned hereby acknowledges and affirms that on or before January 18, 1991, each of us received two copies of the annexed "Notice of Right to Cancel." Furthermore, the undersigned hereby acknowledges and affirms that each of us have [sic] elected not to cancel the transaction to which the annexed Notice relates. / s/ Martha Rodash.
 The underlined portions were handwritten, while the remainder of the page was typewritten boilerplate.
 
 
 [3]
 The statute provides in relevant part:
 [I]n the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the [Federal Reserve] Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section.
 Sec. 1635(a).
 
 
 [4]
 Our conclusion that Rodash's "waiver" had no operative effect is buttressed by the fact, admitted by the appellees' counsel at oral argument, that, despite having signed the Election Not to Cancel, Rodash could have nonetheless rescinded the agreement within the three-day cooling off period
 
 
 [5]
 The appellees' two main contentions are that (1) the Election Not to Cancel was on a separate piece of paper than the Notice of Right to Cancel, and (2) early provision of an election not to rescind is a reasonable, convenient practice for creditors to disburse the funds quickly to the borrower after expiration of the three-day period. These arguments are specious and without merit. First, the regulation states that the notice of the right to cancel "shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the consumer's right to rescind." 12 C.F.R. Sec. 226.23(b)(3). The appellees' contradictory presentment of the waiver form immediately after its presentment of the right to rescind form completely obviates clear and conspicuous disclosure. Second, the early provision serves no purpose. It does not allow the creditor to do anything that the creditor could not have done otherwise, as the Election Not to Cancel had no legal effect and was not binding on the consumer
 
 
 [6]
 Rodash concedes the $6 assignment fee need not have been included in the finance charge
 
 
 [7]
 Regulation Z includes a similar definition:
 The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction.
 
 
 [12]
 C.F.R. Sec. 226.4(a)
 
 
 [8]
 The appellees maintain that a Federal Express charge is analogous to a courier fee and that neither charge is included in the finance charge. We need not address this unsupported assertion, noting only that the appellees' own action in this case undercuts this claim as they in fact treated a courier fee as part of the finance charge
 
 
 [9]
 The nonrecurring intangible tax is 0.2 percent. Fla.Stat.Ann. Sec. 199.133(1) (West 1989). Multiplying the amount of the Note in the transaction at bar, $102,000, times 0.2 percent, yields $204
 
 
 [10]
 Since the transaction at bar was executed, a revised version of the official commentary states:
 A tax imposed by a state ... solely on a creditor is a finance charge if the creditor separately imposes the charge on the consumer. In contrast, a tax is not a finance charge (even if it is collected by the creditor) if applicable law imposes the tax:
 . Solely on the consumer;
 . On the creditor and the consumer jointly; or
 . On the credit transaction, without indicating which party is liable for the tax.
 A tax also is not a finance charge if applicable law imposes the tax solely on the creditor, but directs or authorizes the creditor to pass the tax on to the consumer. (For purposes of this section, if applicable law is silent as to such a pass-on, the law does not authorize the pass-on).
 F.R.B. Commentary on 12 C.F.R. Sec. 226.4(a), Comment 6, reprinted in 12 C.F.R. pt. 226, Supp. I. This additional commentary affirms our reading of Sec. 226.4 because Florida imposes the intangible tax solely on the creditor and does not expressly authorize the creditor to pass the tax on to the consumer.
 
 
 [11]
 We do not discuss Rodash's argument that TILA was violated by an alleged failure of the appellees to respond to Rodash's December 26, 1991 letters of rescission