70 F.3d 937
 64 USLW 2366, 33 Fed.R.Serv.3d 138
 Linwood COWEN and Jean Cowen, on behalf of themselves and
all others similarly situated, Plaintiffs-Appellants,
v.
BANK UNITED OF TEXAS, FSB, doing business as Commonwealth
United Mortgage, Defendant-Appellee.
 No. 95-1334.
 United States Court of Appeals,
Seventh Circuit.
 Argued Sept. 15, 1995.
Decided Nov. 22, 1995.
 
 Daniel A. Edelman, Cathleen M. Combs, Tara G. Redmond, J. Eric Vander Arend, Michelle A. Weinberg (argued), O. Randolph Bragg, Tara L. Goodwin, Edelman & Combs, Chicago, IL, Charles M. Baird, Miami Beach, FL, for Plaintiffs-Appellants.
 Leo J. Asaro (argued), Elizabeth C. Carver, Dan M. Lesicko, Bryan Cave, St. Louis, MO, Daniel Cummings, Elizabeth Porter Staggs, Rothschild, Barry & Myers, Chicago, IL, for Defendant-Appellee.
 Before POSNER, Chief Judge, and CUDAHY and MANION, Circuit Judges.
 POSNER, Chief Judge.
 
 
 1
 The Truth in Lending Act requires lenders covered by the Act to disclose to the borrower at the time of making the loan not only the interest rate but also any "finance charge," defined as a charge that is payable directly or indirectly by the borrower and imposed directly or indirectly by the lender as an incident to or condition of the loan. 15 U.S.C. Sec. 1605(a); 12 C.F.R. Sec. 226.4(a). The concern behind this specific requirement is that a lender might try to make the interest rate look lower than it really is by charging part of the interest in the form of fees for services rendered in connection with the closing of the loan. Rodash v. AIB Mortgage Co., 16 F.3d 1142, 1147-48 (11th Cir.1994); Ralph J. Rohner, The Law of Truth in Lending p 3.02, p. 3-9 (1984). One form this abuse might take--an example of indirect imposition--would be to hire an agent to perform a service in the making of the loan that the lender would normally perform and reflect in the interest rate, and to bill the borrower for the cost of the service, thus concealing part of the interest expense of the loan. That was what happened in Rodash. The plaintiffs accuse the defendant, Bank United of Texas, of the same thing.
 
 
 2
 The plaintiffs borrowed money from the bank in order to refinance their home, on which they had two mortgages that they wanted to replace with a single mortgage from Bank United. The proceeds of the loan secured by this mortgage therefore went to the prior mortgagees to pay off their mortgages. The title insurance company that handled the closing hired an overnight courier to carry Bank United's checks to the mortgagees. The courier's fee was $14, which the title company charged to the plaintiffs. The bank did not disclose the fee on the Truth in Lending disclosure form that it furnished the plaintiffs, and the plaintiffs claim that the omission violated the Act because the fee was really a finance charge. By using an overnight courier rather than the mails the title company actually saved the plaintiffs money, because the extra expense was less than the interest saved by paying off the two mortgages sooner. So the plaintiffs incurred no loss--in fact received a windfall gain--as a result of the bank's alleged violation of the Act. Ordinarily one cannot seek damages (other than, in some cases, punitive damages) unless one has suffered a loss, but the Truth in Lending Act allows a monetary recovery even if the failure to disclose the charge caused the borrower no harm. 15 U.S.C. Sec. 1640(a)(2); Brown v. Marquette Savings & Loan Ass'n, 686 F.2d 608, 614 (7th Cir.1982); Mars v. Spartanburg Chrysler Plymouth, Inc., 713 F.2d 65 (4th Cir.1983); cf. Mourning v. Family Publications Service, Inc., 411 U.S. 356, 376, 93 S.Ct. 1652, 1664, 36 L.Ed.2d 318 (1973); White v. Arlen Realty & Development Corp., 540 F.2d 645 (4th Cir.1975).
 
 
 3
 One case, as it happens one of ours, made an exception for the case in which the violation is "hypertechnical." Herbst v. First Federal Savings & Loan Ass'n, 538 F.2d 1279, 1283 (7th Cir.1976). The case has been praised, but is isolated. (On both points see Ralph C. Clontz, Jr. & James A. Douglas, Truth-in-Lending Manual p 10.04, pp. 10-6 to 10-7 (6th ed. 1991).) It was limited in Brown v. Marquette Savings & Loan Ass'n, supra, 686 F.2d at 612-13, to cases in which the lender inadvertently failed to bring documents executed prior to the enactment of the Truth in Lending Act into conformity with the Act. Outside of that narrow exception, inapplicable to this case, hypertechnicality reigns. See, e.g., Smith v. No. 2 Galesburg Crown Finance Corp., 615 F.2d 407, 416 (7th Cir.1980), overruled on unrelated grounds in Pridegon v. Gates Credit Union, 683 F.2d 182, 194 (7th Cir.1982). We need not decide whether Herbst should be given a broader meaning; nor the distinct question whether if, as in this case, the violation actually benefits the borrower, rather than merely not hurting him, the lender can offset the benefit against the cost, here reducing the borrowers' damages below zero. No cases have addressed the latter question, though if penalties can be collected by people who have not been harmed by the violation, we suppose they can be collected by people actually benefited by them.
 
 
 4
 Even with these issues set to one side, a suit for $14 (or $24--for the plaintiffs contend that a $10 assignment fee should also have been disclosed) may seem a quixotic project. Not so. First of all, the plaintiffs, if they win, would be entitled to statutory damages of $1000 without any proof of injury, because 15 U.S.C. Sec. 1640(a)(2)(A) allows the recovery of twice the finance charge up to $1000, and the finance charge here exceeded $500 (by quite a bit--$45,027.32, to be exact). Mars v. Spartanburg Chrysler Plymouth, Inc., supra, 713 F.2d at 67. Second, and more important, the plaintiffs are attempting to sue on behalf of a class of similarly situated customers of Bank United. The bank elected to move for summary judgment before the district judge decided whether to certify the suit as a class action. This is a recognized tactic, 2 Herbert B. Newberg & Alba Conte, Newberg on Class Actions Sec. 7.03, p. 7-11 (3d ed. 1992); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Sec. 1798, p. 433 (1986), and does not seem to us improper. It is true that Rule 23(c)(1) of the civil rules requires certification as soon as practicable, which will usually be before the case is ripe for summary judgment. Bennett v. Tucker, 827 F.2d 63, 67 (7th Cir.1987); Watkins v. Blinzinger, 789 F.2d 474, 475 n. 3 (7th Cir.1986). But "usually" is not "always," and "practicable" allows for wiggle room. Class actions are expensive to defend. One way to try to knock one off at low cost is to seek summary judgment before the suit is certified as a class action. A decision that the claim of the named plaintiffs lacks merit ordinarily, though not invariably, Nelson v. Murphy, 44 F.3d 497, 500 (7th Cir.1995); 1 Newberg & Conte, supra, Sec. 2.27--illustrating the principle, to which naturally there are exceptions, that there are no valid generalizations about American law today--disqualifies the named plaintiffs as proper class representatives. The effect is to moot the question whether to certify the suit as a class action unless the lawyers for the class manage to find another representative. Hardy v. City Optical Inc., 39 F.3d 765, 770 (7th Cir.1994); Glidden v. Chromalloy American Corp., 808 F.2d 621, 626 (7th Cir.1986). They could not here because the ground on which the district court threw out the plaintiff's claims would apply equally to any other member of the class. After granting the defendant's motion for summary judgment, therefore, and since (as was predictable, given the district judge's ground) no one stepped forward to pick up the spear dropped by the named plaintiffs, the judge denied the motion for class certification.
 
 
 5
 When the procedure that we have just described is followed, the defendant loses the preclusive effect on subsequent suits against him of class certification but saves the added expense of defending a class action and may be content to oppose the members of the class one by one, as it were, by moving for summary judgment, every time he is sued, before the judge presiding over the suit decides whether to certify it as a class action. If we reverse, the plaintiffs will be able to renew their motion for class certification; that is no doubt why they appealed the adverse judgment in this ostensibly trivial case.
 
 
 6
 On to the merits. A bank when it refinances a home has, of course, an interest in the prompt repayment of the mortgage or (as here) mortgages that its mortgage is replacing. For until those mortgages are repaid they will not be discharged, and until they are discharged they will remain listed in the title registry as liens senior to the refinancing bank's new mortgage lien. 1 Grant S. Nelson & Dale A. Whitman, Real Estate Finance Law Sec. 1.1, p. 5 (3d ed. 1993). It is true, as the bank emphasizes, that the title insurance policy issued to the bank by the title company that handled the closing went into effect at the closing, so that the bank was protected by the title insurance if the title company tarried in paying off and obtaining the discharge of the prior mortgages. But an insured ordinarily and we assume here would prefer to avoid a loss rather than to enforce an insurance contract. So, as the plaintiffs argue, it was surely in the bank's interest that the title company use a fast method of repayment. An affidavit submitted on the plaintiffs' behalf by an experienced real estate lawyer states, plausibly enough, that "lenders require that the closing attorney ensure that all outstanding liens be discharged," and here an attorney employed or retained by the title company was acting as the closing attorney. Given its interest in prompt discharge of outstanding liens, the bank itself might have decided to send the checks directly to the mortgagees rather than sending them via the title company, and if it had done so by courier and charged the expense to the borrowers, the plaintiffs, this would have been classified as a finance charge because it would have been a charge for a service that was a condition of making the loan. The statute would be squarely applicable. 15 U.S.C. Sec. 1605(a); Rodash v. AIB Mortgage Co., supra, 16 F.3d at 1147-48. Why should it make a difference if the bank hires an agent for this purpose?
 
 
 7
 It would not have made a difference, if the bank had directed the title company to send the checks by overnight courier and bill the borrowers. The bank would simply have been delegating to an agent one of the chores in the making of a loan, and the receipt by the agent would be imputed to the principal. First Acadiana Bank v. FDIC, 833 F.2d 548, 550 (5th Cir.1988); 12 C.F.R. pt. 226, Supp. I, Sec. 226.4(a)-3. Otherwise the statutory requirement of disclosure of finance charges would be easily evaded. But the bank did not direct the title company to use an overnight courier. Not explicitly, at any rate. The plaintiffs presented evidence that it was the practice of title companies to transmit repayments of prior mortgages in this way. The plaintiffs use this evidence to argue that if the bank knew and, for the reason explained in the previous paragraph, desired the title company in the transaction with these borrowers to adhere to the customary practice, this was the equivalent of the bank's requiring the title company to use an overnight courier. The title company should therefore be deemed the bank's agent.
 
 
 8
 This conclusion is too quick. The title company in this case was wearing two hats. Primarily it was an insurance company, with its own interest in removing the prior liens. In this respect it was a principal in the transaction. It was also the closing agent, which means that it was the agent of the bank. Sibley v. Federal Land Bank, 597 F.2d 459, 462-63 (5th Cir.1979). Possibly of the borrowers as well, but Sibley holds that it is only the bank's agent and we accept that for purposes of our decision. When the title company decided to dispatch the checks by courier, it was doing something that it would have done even if it had not been the bank's agent, but solely a principal in the transaction.
 
 
 9
 We have not found any previous decision under the Truth in Lending Act that deals with an activity undertaken in dual roles. The closest is First Acadiana Bank, supra, where the lender required the borrower to use a lawyer of the bank's choice, and the lawyer's fee, though paid by the borrower, was deemed a finance charge. If the lawyer was to be the borrower's agent, the decision is wrong; if the bank's agent, cf. Sibley v. Federal Land Bank, supra, it was right. The court did not discuss the issue of agency, so we may assume, giving our respected sister court the benefit of the doubt, that the lawyer was to be the bank's agent. The case is then distinguishable from ours because in hiring a courier the title company was protecting its own interest as an insurance company as well as the bank's interest as lender.
 
 
 10
 In this welter of doubt we turn with relief to the staff of the Federal Reserve Board, which in "official staff commentary," to which the Supreme Court has emphatically told us to give great weight in interpreting the Truth-in-Lending Act and the regulations under it, Ford Motor Credit Co. v. Milhollin, 444 U.S. 555, 565-70, 100 S.Ct. 790, 796-99, 63 L.Ed.2d 22 (1980), has decided that "a fee for courier service charged by a settlement agent to send a document to the title company or some other party is not a finance charge, provided that the creditor has not required the use of a courier or retained the charge." 12 C.F.R. pt. 226, Supp. I, Sec. 226.4(a)-4; 60 Fed.Reg. 16771, 16777 (April 3, 1995) (emphasis added). This staff commentary was issued after the transaction at issue in this case, and the plaintiffs, who tell us that the commentary was issued under "pressure" from the banking community, argue that we should give it no weight at all. We think it entitled to at least some weight as an interpretation of the statute--the objection based on retroactivity falls away when the commentary is deemed interpretive rather than legislative, and the commentary in question purported to clarify rather than to change existing law, 60 Fed.Reg. at 16772; Hickey v. Great Western Mortgage Corp., 1995 WL 317095 (N.D.Ill. May 23, 1995)--by an agency that knows more about banking that we do and that cannot be criticized for listening to what bankers have to say.
 
 
 11
 The title company was not required by Bank United to use an overnight courier. Had the company used an even faster method, such as an electronic funds transfer or a same-day messenger, the bank would not have complained. It would be contrary to the intended meaning of the staff commentary to construe "required" loosely, as "anticipated"; for it is plain that the staff was contemplating a case exactly like the present. We can stop right here, if the staff commentary is authoritative. If not, if it is merely persuasive, then we are persuaded. The difficulty that has given rise to this case comes from the fact that many of the services rendered at a closing, such as paying off prior mortgagees, benefit all the participants, including the lender. Were there no title companies the charges that these companies make at closings would be imposed by the lenders and would be finance charges within the meaning of the Truth in Lending Act because the services are a condition of the loan. But when the title company is making its own decisions on how to carry out its responsibility as settlement agent at a closing the lender is not responsible and the Act is not in play, even if the lender has a perfectly clear idea of what the title company is going to do. Any other conclusion would rapidly expand the concept of "finance charge" to encompass every fee by whomever charged in connection with the making of a loan.
 
 
 12
 This completes our discussion of the courier fee. As for the $10 assignment fee, the evidence is indisputable that it was in fact disclosed, and anyway the regulations provide a safe harbor for mistakes that do not exceed $10 in a loan of the size involved here. 12 C.F.R. Sec. 226.18(d) n. 41.
 
 
 13
 The remaining issues are procedural. Although the district judge's action in dismissing the plaintiff's pendent (or as they are now called, "supplemental") state law claims on the merits, even though the federal claim had not gone to trial, was unusual and may even have been precipitate, Olive Can Co. v. Martin, 906 F.2d 1147, 1153 (7th Cir.1990); Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n, 805 F.2d 663, 682 (7th Cir.1986), the plaintiffs ask that these claims be reinstated only if we reverse the dismissal of their federal claim; and so the condition for reinstatement is not satisfied.
 
 
 14
 The plaintiffs complain that the judge should not have denied their motion to file an amended complaint, adding further allegations of violation of the Truth in Lending Act, without giving them more time to conduct pretrial discovery. When as in this case the motion to amend is filed after a responsive pleading has been served, permission to amend is discretionary with the district judge. Fed.R.Civ.P. 15(a); Perrian v. O'Grady, 958 F.2d 192, 194 (7th Cir.1992). And controlling the pace and scope of discovery, being a matter of case management rather than of the application of hard and fast rules, is also within the district judge's discretion. Leffler v. Meer, 60 F.3d 369, 374 (7th Cir.1995). We must ask whether Judge Leinenweber acted arbitrarily, unreasonably, in refusing to allow the plaintiffs to conduct additional discovery before he ruled on their motion to amend the complaint. We do not think so. The plaintiffs moved to amend after discovery had been completed, so that if the amendment had been granted it would have been necessary to reopen discovery. In cases in which damages are sought for technical violations, plaintiffs cannot expect as much judicial patience as in cases in which substantial rights are at stake.
 
 
 15
 The plaintiffs complain that in refusing to allow them to amend their complaint the judge was not exercising discretion, but instead applying a "rule" of the First Circuit that when an amendment to a complaint is proposed after the defendant has moved for summary judgment, the plaintiff must show that the amendment is supported by "substantial and convincing evidence." That is indeed what Resolution Trust Corp. v. Gold, 30 F.3d 251, 253 (1st Cir.1994), and Torres-Matos v. St. Lawrence Garment Co., 901 F.2d 1144, 1146 (1st Cir.1990), cited by Judge Leinenweber, say; but in neither case, nor in Judge Leinenweber's opinion, is the statement presented as a rule to confine the district court's discretion. A plaintiff who proposes to amend his complaint after the defendant has moved for summary judgment may be maneuvering desperately to stave off the immediate dismissal of the case. With this a possibility, district judges are not content with an allegation sufficient in law; they want to see some evidence to back it up. The district judge here was not persuaded that the plaintiffs had come up with solid enough evidence to warrant keeping the case going after the completion of discovery, and as we cannot say that the judge acted unreasonably, we are bound.
 
 
 16
 AFFIRMED.