**Christopher NOEL and Mary Noel, Sandra B. Curtis, individually and on behalf of the Estate of Homer E. Curtis, Leno A. Jaxon, Molly A. Myers–Berman, on their own behalf and on behalf of a class of similarly situated persons, Plaintiffs,**

v.

**FLEET FINANCE, INC., Fleet Financial Group, Inc., Birmingham Bancorp Mortgage Corporation, Express Mortgage Brokers, Inc., Sterling Mortgage & Investment Co., and John Doe Corporations 1–10, Defendants.**

No. 95–73457.

United States District Court,
E.D. Michigan,
Southern Division.

July 21, 1997.

Francis C. Flood, James C. Steffl, Charles J. Gerlach, Kemp, Klein, Umphrey & Endelman, P.C., Troy, MI, for Plaintiffs.

John E. Jacobs, Jonathan B. Frank, Mason, Steinhardt, Jacobs & Perlman, Southfield, MI, for Defendants Birmingham Bancorp Mortgage Corporation, Express Mortgage Brokers, Inc., and Sterling Mortgage & Investment Co.

Donald S. Young, Ann Marie Ronchetto, Dykema Gosset, Detroit, MI, for Defendants Fleet Finance, Inc. and Fleet Financial Group, Inc.

## MEMORANDUM OPINION AND ORDER

GILMORE, District Judge,

### I.

The Plaintiffs in the present cause of action are Christopher Noel, Mary Noel, Sandra B. Curtis ("Curtis"),[1] Leno A. Jaxon, and Molly A. Myers–Berman ("Myers–Berman"). The Defendants are Fleet Financial Group, Inc. ("FFG"), Fleet Finance, Inc. ("FFI"), Birmingham Bancorp Mortgage Corporation ("Birmingham"), Express Mortgage Brokers, Inc. ("Express"), Sterling Mortgage & Investment Co. ("Sterling"), and John Doe Corporations 1–10.[2]

FFG is a publicly-traded Rhode Island holding company which engages in all aspects of consumer and commercial lending, mortgage financing, and banking. It is purported to be the largest banking franchise in the northeast United States, where it owns at least five banks. FFI, a Delaware corporation, is a wholly-owned subsidiary of FFG. The principal offices of FFI are located in Atlanta, Georgia, and branch offices of FFI have operated in the Michigan cities of Southfield, Okemos, and Grand Rapids. FFG and FFI are jointly referred to herein as "Fleet."

Birmingham, Express, and Sterling are all Michigan corporations that are licensed in Michigan as mortgage brokers, lenders, and servicers pursuant to the Michigan Mortgage Brokers, Lenders, and Servicers Act, M.C.L. §§ 445.1651 *et seq.* ("Mortgage Act"). The Plaintiffs allege that these parties have entered into agreements with Fleet whereby they locate borrowers and originate loans for Fleet in exchange for certain fees. Express is an affiliate of and broker for Sterling. Where appropriate, these two parties will be referred to jointly as "Sterling/Express."

The Plaintiffs, all of whom reside in Michigan, took out loans which are currently owned and financed by Fleet. Some of those loans were originated directly by Fleet. Others were originated by Birmingham or Sterling/Express and assigned thereafter to Fleet. Specifically, Birmingham originated the loan issued to Curtis and her deceased husband, and Sterling/Express originated the loan issued to Myers–Berman. The various loans financed by Fleet for the Plaintiffs are the focus of the present case.

The Plaintiffs filed the present suit on August 25, 1995, and an Amended Complaint on December 22, 1995. The Plaintiffs claim that the Defendants are engaged in an unlawful lending scheme which is carried out in three separate phases—an origination phase, a servicing phase, and a profit-taking phase. The Amended Complaint brings nineteen separate Counts against the Defendants under both state and federal law.

---

1. Curtis brings claims in her individual capacity as well as on behalf of the estate of her deceased husband, Homer E. Curtis.

2. The Plaintiffs' Motion to Certify the Class is pending before the Court.

The parties are now before the Court on a Motion to Dismiss pursuant to Fed.R.Civ.P. 9 ("Rule 9") and Fed.R.Civ.P. 12(b)(6) ("Rule 12(b)(6)"). This Motion is brought by only three of the five named Defendants—Birmingham, Express, and Sterling (hereinafter, the "Movants").[3] The Movants are implicated in only the first phase of the alleged unlawful activity—the origination phase. As such, this Memorandum focuses solely on that phase of the allegedly unlawful conduct.

## II.

Rule 12(b)(6) provides that

[e]very defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is required, except that the following defenses at the option of the pleader may be made by motion: (6) failure to state a claim upon which relief may be granted.

The Sixth Circuit has often discussed how a trial court is to review a Rule 12(b)(6) motion. It states that a trial court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac,* 41 F.3d 1061, 1064 (6th Cir.1994); *see also Miller v. Currie,* 50 F.3d 373, 377 (6th Cir.1995). Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses." *Miller,* 50 F.3d at 377. As put by the Supreme Court,

When a federal court reviews the sufficiency of a complaint, before the reception of any evidence[,] its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test.

*Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (*quoted in Miller,* 50 F.3d at 377). Thus, the court should deny a Rule 12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Gazette,* 41 F.3d at 1064; *see also Miller,* 50 F.3d at 377; *Vemco, Inc. v. Camardella,* 23 F.3d 129, 132 (6th Cir.1994).

In addition, Rule 9(b) provides that

[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally.

Because of its limited scope, Rule 9(b) is relevant only to Count Thirteen, the Plaintiffs' common law fraud claim.

## III.

This Court must accept as true all factual allegations and permissible inferences in the Amended Complaint. *Gazette,* 41 F.3d at 1064. Those facts which are relevant to the present Motion are as follows:

Fleet is in the business of "non-conforming loans." Non-conforming loans are high interest rate, high fee loans made to applicants who have typically been denied loans by conventional lenders. Fleet both originates and purchases a certain type of non-conforming loan—the type secured by the borrower's home. The wide majority of loans made by Fleet to Michigan homeowners were originated by the Movants. Fleet purportedly established a relationship with the Movants over the course of several years. The Plaintiffs describe that relationship as "an ongoing organization" with a "common or shared purpose." The alleged common or shared purpose is to make a high quantity of non-conforming loans to unsuspecting homeowners upon unconscionable terms that frequently drive those persons into default.

Birmingham and Sterling hold themselves out to the Michigan public as mortgage lend-

---

**3.** Curtis and Myers–Berman are the named Plaintiffs alleged to have contracted with the Movants. As such, this Memorandum Opinion

ers,[4] and they are in fact licensed to make mortgage loans in Michigan. However, the Plaintiffs claim that in reality Birmingham and Sterling are brokers who merely disguise themselves in lenders' clothing. In other words, the Plaintiffs argue that when borrowers submit loan applications to Birmingham and Sterling, they are led to believe that they are applying to borrow money from the Movant to whom they submit the application. The Plaintiffs argue that such borrowers are actually submitting applications to Fleet, the lender-in-fact. The scheme allegedly works as follows:

Each time that Birmingham or Sterling receives a loan application, it turns that application over to Fleet, who then reviews the application in accordance with its own established underwriting procedures.[5] Fleet's review includes an appraisal of the applicant's ability to repay the loan, of the adequacy of the home serving as collateral for the loan, and of the applicant's credit and employment histories. When it approves a particular loan, Fleet sets certain minimum specifications for that loan. The most important of these specifications are the interest rate and the "loan-to-value ratio." The loan-to-value ratio is the ratio of the amount of the loan to the appraised value of the home used to secure the loan. In virtually all instances, Fleet insists that the loan-to-value ratio fall between 60% and 70%, regardless of the amount requested in the loan application.

After Fleet approves a particular loan application and sets the minimum specifications for that loan, it returns the application to the appropriate Movant (whether it be Birmingham or Sterling), who then originates the loan naming itself as the lender. The Movant then immediately assigns the loan to Fleet, who in turn pays out the loan to the borrower and undertakes the financing and administration of the loan. The borrower is never aware of Fleet's existence prior to the assignment of the loan. The Plaintiffs refer to this system, whereby there is a contempo-

raneous advance of loan funds and assignment of the loan to the party advancing the funds, as "table funding." They also refer to the loans which arise out of this system as "wholesale loans."

The Plaintiffs allege that Fleet insists upon a 60–70% loan-to-value ratio for a very particular reason. They argue that, given this ratio, a default is a profitable event for Fleet. Specifically, in the event of default, Fleet forecloses on the borrower's home and receives an amount 30–40% higher than the amount of the loan. The Plaintiffs refer to that 30–40% as Fleet's "equity cushion." Given this fact, the Plaintiffs contend that the loan application review process, beyond the appraisal of the home serving as the collateral, is essentially a sham. In short, the Plaintiffs claim that Fleet profits from defaults and that it is therefore largely indifferent to a borrower's ability to repay. They also claim that Fleet often intentionally secures artificially low home appraisals (or, "low-ball appraisals") in order to raise its profit margin at the time of default above the usual 30–40%.

In sum, the Plaintiffs claim that Fleet faces no substantial investment risk. They claim that Fleet derives high profits regardless of whether borrowers repay their loans in compliance with the unconscionable terms or whether they default. Thus, they argue that Fleet has great incentive to lend indiscriminately and to encourage each of the Movants to bring in a high volume of loan applications. Fleet purportedly provides such encouragement in the form of two fees. The first fee is paid to a Movant each time it originates a loan approved by Fleet ("origination fee"). The second fee is a bonus paid to a Movant each time it originates a loan at an interest rate higher than the minimum interest rate approved by Fleet for that particular loan. Fleet rewards the Movant for this maneuver by paying it an amount equal to at least 75% of the "yield spread"[6] multi-

---

and Order hereafter refers to Curtis and Myers–Berman only when using the term "Plaintiffs."

**4.** Express, on the other hand, holds itself out as a broker for Sterling.

**5.** The Plaintiffs claim that in most cases the very loan applications were generated by Fleet.

**6.** The yield spread is the difference between the interest rate specified by Fleet and the actual

plied by the amount of the loan. This fee is referred to as the "yield spread premium." Fleet purportedly holds the remaining 25% in a reserve fund which serves as a security against the future good performance of the Movant. The Plaintiffs allege that the yield spread phenomenon generates huge additional profits for both the Movants and Fleet.

The Plaintiffs and the Movants disagree about the roles played by Birmingham and Sterling under these facts.[7] The Movants contend that Birmingham and Sterling are mortgage lenders who simply sell many of their loans to Fleet in the secondary market. The Plaintiffs, however, insist that Birmingham and Sterling must be viewed as mortgage brokers, rather than as independent lenders. Specifically, the Plaintiffs argue that Birmingham and Sterling served as brokers both for Fleet (for whom they find borrowers) and for the Plaintiffs (for whom they find lenders). As such, they contend that Birmingham and Sterling served, in effect, as dual agents.

## IV.

The Amended Complaint brings nineteen Counts against Fleet and the Movants. The Movants now ask to be dismissed from each of those Counts under Rules 12(b)(6) and 9(b).

This Court held a hearing on the Movant's Motion to Dismiss on March 18, 1997. As stated on the record and for the reasons stated from the bench, this Court has made the following findings:

(1) The Motion to Dismiss is granted as to Count Three of the Amended Complaint. As such, Count Three, brought under the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.901 *et seq.*, is dismissed with prejudice as against the Movants.

(2) The Motion to Dismiss is granted as to Count Five. As such, Count Five, the Plaintiffs' civil conspiracy claim, is dismissed without prejudice as against the Movants.

interest rate set by the Movant at the time of the origination.

(3) The Motion to Dismiss is denied as to Count Nine, the Plaintiffs' breach of fiduciary duty claim.

(4) The Motion to Dismiss is granted as to Count Ten. As such, Count Ten, the Plaintiffs' claim under the "shingle theory" of liability, is dismissed with prejudice as against the Movants.

(5) The Motion to Dismiss is granted as to Counts Fourteen through Nineteen. Counts Fourteen through Nineteen, brought under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, are dismissed without prejudice as against the Movants.

(6) The Plaintiffs are permitted fourteen days from the date of this Memorandum Opinion and Order to file a Second Amended Complaint solely for the purpose of restating those Counts dismissed without prejudice from the bench.

(7) The Plaintiffs concede that they bring no cause of action against the Movants under Counts Six, Seven, and Twelve.

At the March 18 hearing, this Court took the Movants' Motion to Dismiss as to Counts One, Two, Four, Eight, Eleven, and Thirteen under advisement. This Memorandum Opinion and Order sets forth this Court's ruling on those remaining issues.

## V.

At Count One, the Plaintiffs claim that the Movants violated the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.* A brief discussion of TILA is in order.

Enacted in 1968, TILA was specifically designed to remedy problems that had developed from the rapidly expanding use of consumer credit. *Purtle v. Eldridge Auto Sales, Inc.*, 91 F.3d 797, 799–800 (6th Cir.1996). Congress designed TILA to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing, *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980), and thereby to balance the scales thought to be weighed in favor of lenders in favor of borrowers. *Bizier v.*

7. The parties seem to be in agreement that Express served as Sterling's broker.

*Globe Financial Services, Inc.,* 654 F.2d 1, 3 (1st Cir.1981). As such, the Act ensures a meaningful disclosure of credit terms to enable consumers to compare readily the various credit terms available in the marketplace. *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142, 1144 (11th Cir.1994).

In line with the foregoing, TILA's declaration of purpose reads as follows:

> The Congress finds that economic stabilization would be enhanced and the competition among the various financial institutions ... would be strengthened by the informed use of credit. The informed use of credit results from an awareness of the cost thereof by consumers. It is the purpose of this [statute] to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him....

15 U.S.C. § 1601(a). In like manner, the Sixth Circuit has held that

> TILA's purpose is two-fold: to facilitate the consumer's acquisition of the best credit terms available; and to protect the consumer from divergent and at times fraudulent practices stemming from the uninformed use of credit.

*Jones v. TransOhio Savings Ass'n,* 747 F.2d 1037, 1040 (6th Cir.1984). The Federal Reserve Board ("FRB") has been delegated the power to promulgate regulations to carry out this purpose. 15 U.S.C. § 1604; *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 559–60, 100 S.Ct. 790, 793–94, 63 L.Ed.2d 22 (1980); *Thomka,* 619 F.2d at 248. The FRB's regulations are set out at 12 C.F.R. § 226.1 *et seq.,* or "Regulation Z."

TILA effectuates Congress' mandate primarily by imposing disclosure requirements on those who extend credit to consumers. *Purtle,* 91 F.3d at 799. Specifically, at § 1632(a), TILA requires that each "creditor" clearly and conspicuously disclose certain aspects of each credit transaction to the borrower. The information that the creditor is required to disclose in this manner is listed in the statute at 1638(a) and in Regulation Z at 12 C.F.R. 226.18. At § 1632(b), TILA also provides that any creditor may make additional disclosures beyond those that are specifically required.

 It is well established that creditors must strictly comply with TILA's requirements. *Rodash,* 16 F.3d at 1144; *Jackson v. Grant,* 890 F.2d 118, 120 (9th Cir.1989); *Mars v. Spartanburg Chrysler Plymouth, Inc.,* 713 F.2d 65, 67 (4th Cir.1983). Even technical or minor violations of TILA impose liability on the creditor. *Jackson,* 890 F.2d at 120. In addition, the Sixth Circuit stresses that TILA is a remedial statute and should be construed liberally in favor of the consumer. *Jones,* 747 F.2d at 1040.

 In the event that a creditor fails to disclose any of the credit terms required under TILA and its regulations, a consumer may bring a civil action against the creditor. 15 U.S.C. § 1640; *Purtle,* 91 F.3d at 800. A plaintiff in a TILA case need not prove that he or she suffered actual monetary damages in order to recover the statutory damages and attorneys fees. *Purtle,* 91 F.3d at 800. Nor is it necessary to show that the consumer was actually misled or deceived by an ambiguous credit term in order to prevail. *Purtle,* 91 F.3d at 800.

In their Amended Complaint, the Plaintiffs claim that the Movants violated the disclosure requirements of TILA in two ways. First, they argue that the Movants failed to inform the Plaintiffs [8] of a particular finance charge. Specifically, they contend that the Movants failed to disclose, or otherwise "disguised," the existence of the yield spread premium. Second, the Plaintiffs claim, apparently in the alternative, that the Movants voluntarily disclosed the yield spread premium in an inaccurate and misleading manner. Birmingham, Sterling, and Express now move to dismiss Count One as against them.

---

8. Again, the "Plaintiffs" for purposes of this Memorandum Opinion and Order are Curtis and Myers–Berman. As such, the Movants' argument that not all of the loans assigned by Birmingham and Sterling to Fleet were assigned under similar circumstances need not prevent the Court from making the present determination. Such arguments will become relevant as the Court decides whether to certify a class.

### A.

The first issue the Court must address is whether the Movants are "creditors" under TILA and, by extension, whether they are subject to the disclosure requirements of TILA.

TILA defines a creditor as

a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of the indebtedness....

15 U.S.C. § 1602(f). In nearly identical language, Regulation Z defines a creditor as

a person (A) who regularly extends consumer credit that is subject to a finance charge or is payable by written instrument in more than four installments (not including a down payment), and (B) to whom the obligation is initially payable[,] on the face of the note....

12 C.F.R. § 226.2(a)(17).

■ The Court rejects the Plaintiffs' suggestion that further discovery is required to determine whether the Movants are creditors as defined by TILA.[9] Rather, accepting as true the factual allegations in the Amended Complaint, the Court finds that Birmingham and Sterling are creditors governed by the disclosure requirements of TILA. First, the Plaintiffs aver that the very business of Birmingham and Sterling is to offer non-conforming loans to the public, and the primary allegation at issue is that Birmingham and Sterling generally assess borrowers an undisclosed finance charge. Under these facts, Birmingham and Sterling "regularly extend[ ] consumer credit that is subject to a finance charge." Therefore, the first half of the definition of creditor is satisfied. Second, the Plaintiffs aver that Birmingham and Sterling originated the Plaintiffs' loans by putting themselves forward as lenders. They also allege that those loans were closed in the name of Birmingham and Sterling. Indeed, the Plaintiffs are alleged to have been unaware of the existence of Fleet until after they closed their loans. Thus, Birmingham and Sterling were the parties "to whom the obligation[s were] initially payable ... on the face of the note," and the second half of the definition of creditor is also satisfied.

■ On the other hand, the Court finds that, taking the factual allegations in the Amended Complaint as true, Express is not a creditor under TILA. Rather, Express can only be viewed as a broker or agent for Sterling. There are no allegations that Express presented itself as a creditor or that it is a party to whom any obligation was initially payable. As such, Express is not a creditor subject to the disclosure requirements of TILA, and Count One must be dismissed with prejudice as against it.

### B.

The next issue the Court must address is whether Count One is time barred.

TILA, at 15 U.S.C. 1640(f), provides that "[a]ny action under this section may be brought ... within one year from the date of the occurrence of the violation." The Sixth Circuit has clearly held, however, that TILA's statute of limitations is subject to equitable tolling "in appropriate circumstances." *Jones*, 747 F.2d at 1043. Specifically, it held that where the plaintiff alleges that the TILA violations were fraudulently concealed, "the limitations period runs from the date on which the borrower discovers or had reasonable opportunity to discover the fraud involving the complained of TILA violation." *Jones*, 747 F.2d at 1043. In so doing, it stressed that "Congress' jurisdictional grant of power to the federal courts is [not] so fragile as to be defeated by the intentionally fraudulent designs of those who unscrupulously would seek to avoid rightful claims of protection by the exercise of that power." *Jones*, 747 F.2d at 1041. Furthermore, in a later case adopting the Sixth Circuit's holding on this matter, the Ninth Circuit stressed that "fraudulent concealment

---

**9.** The Movants concede that Birmingham and Sterling are creditors under TILA, while the Plaintiffs state that they "appear to be" creditors under TILA.

and equitable tolling involve factual determinations." *King v. California*, 784 F.2d 910, 915 (9th Cir.1986).

■ The Movants point out that Curtis and Myers–Berman, the Plaintiffs with whom the Movants contracted, closed their loans in 1990 and 1992, respectively. Given that the present claim was filed in 1995, they argue that Count One is time barred. The Plaintiffs acknowledge that the present suit was filed more than a year after the Movants' alleged TILA violations occurred. However, they allege that they did not learn of or have a reasonable opportunity to discover the alleged violations prior to 1995. Specifically, they claim that Birmingham and Sterling "actively concealed" pertinent information and continue to do so. As such, the Court would err to dismiss Count One under 15 U.S.C. § 1640(e) under Rule 12(b)(6). Taking the Plaintiffs' allegations as true, the statute of limitations on the Plaintiffs' claims against Birmingham and Sterling did not begin to run until 1995 and this case is timely.

### C.

The primary dispute between the parties is whether the yield spread premium paid to Birmingham and Sterling was a "prepaid finance charge" upon Curtis and Myers–Berman, respectively.

Again, TILA requires that the creditor "clearly and conspicuously" disclose certain aspects of a credit transaction to the borrower. 15 U.S.C. 1632(a). The information that the creditor is required to disclose in this manner is listed in the statute at 1638(a) and in Regulation Z at 12 C.F.R. 226.18. Included in the list is the "finance charge." 15 U.S.C. 1638(a)(3); 12 C.F.R. 226.18(d).

In Count One, the Plaintiffs allege that Birmingham and Sterling violated TILA by "disguis[ing] the existence of the ... yield spread premium and [by] fail[ing] to include these payments in the 'prepaid finance charge.'" The Movants now argue that Count One must be dismissed as against Birmingham and Sterling for a simple reason: the yield spread premium paid to Birmingham and Sterling was not a finance charge. In addition, the Movants argue that

even if the Court finds that the yield spread premium is in fact a finance charge, it cannot be viewed as a *prepaid* finance charge.

■ As an initial matter, the Court finds that the yield spread premium described in the Amended Complaint is a finance charge under TILA. TILA defines a finance charge as

> the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit.

15 U.S.C. 1605(a). In similar language, Regulation Z defines a finance charge as

> the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.

12 C.F.R. 226.4(a). One aspect of this definition is of particular significance to the present determination. To meet the definition of finance charge, a charge need only be payable indirectly by the borrower, and it need only be an indirect condition on the extension of credit. In other words, a charge which the consumer does not pay directly and which is only indirectly a condition to the extension of credit is as much a finance charge under TILA as charges paid directly by the borrower and which are direct conditions on the extension of credit.

The Court finds that common sense points to the conclusion that the yield spread premium was paid indirectly by the Plaintiffs. Under the facts averred by the Plaintiffs, Fleet rewarded Birmingham and Sterling for originating the Plaintiffs' loans at an interest rate higher than the interest rates approved by Fleet by paying them an amount equal to at least 75% of the yield spread multiplied by the amount of each loan. In the event that Birmingham or Sterling originated the loan at the same interest rate approved by Fleet, no yield spread premium would be paid. As such, it appears that while the yield spread premiums were paid to Birmingham and Sterling directly by Fleet, they were paid indirectly by the Plaintiffs. Without the

higher interest rates, no yield spread premiums would have been forthcoming.

The Movants point out that many borrowers default on their loans and therefore never make full repayment of their loans or of the interest due. They argue that this fact shows that the yield spread premium is not paid by the borrowers, as a borrower who does not meet her obligations cannot be said to have paid the yield spread premium. The Court does not agree with this logic. A borrower who defaults continues to be liable for her obligation. Because the borrower may satisfy that obligation by a loss of collateral or other security does not change the Court's conclusion that the yield spread premium is indirectly payable by that borrower.

Second, the Court also finds that the yield spread premium was an indirect condition on the extension of credit by Birmingham and Sterling. Although the fact of a yield spread premium was not revealed to the Plaintiffs, they were nevertheless required to agree to it in order to consummate their loan transactions. That is, given the finding that the yield spread premiums were payable indirectly by the Plaintiffs in the form of higher interest payments or collateral, the yield spread premium must then be viewed as a charge that the Plaintiffs were required to accept as a condition to the extension of credit. Thus, the Court finds that the yield spread premium meets both of the elements of the definition of a finance charge under TILA. As such, Birmingham and Sterling were required to disclose its existence to the Plaintiffs.

The Movants attempt to defeat this conclusion in several ways. First and foremost, they argue that, even if the yield spread premium was a finance charge, Birmingham and Sterling did in fact disclose its existence by disclosing the increased interest rate. In effect, they argue that because the Plaintiffs accepted the interest rate proposed to them by Birmingham and Sterling, they agreed to the yield spread premiums, albeit indirectly. Furthermore, they argue that such an indirect disclosure is appropriate, as the Plaintiffs were not entitled to be informed of the profits earned by Birmingham and Sterling on the transactions.

The Court is not persuaded by these arguments. First, the Movants have failed to demonstrate that TILA allows for finance charges of any kind to be disclosed to a borrower "indirectly." Indeed, the purpose of TILA was to mandate "clear and conspicuous" disclosures of the cost of credit. As such, the Court declines to accept the Movants' argument that Birmingham and Sterling met their obligations to disclose the yield spread premium through the disclosure of the increased interest rate. The Court is similarly not persuaded by the Movants' argument that the Plaintiffs were not entitled to knowledge of Birmingham and Sterling's profits from the transactions. Although this argument may carry more weight in the context of the retail transactions that the Movants discuss, TILA was enacted precisely to allow for in-depth financial disclosures in credit transactions.

The Movants argue next that to require creditors to make a separate disclosure of yield spread premiums would confuse potential borrowers as to the actual cost of credit and thereby thwart the purposes of TILA. They contend that if a borrower is told that he will be required to pay a finance charge called a yield spread premium, she may be lead to believe that she will be required to pay an additional charge beyond the interest rate. Thus, they argue that a requirement that the yield spread premium be marked as a finance charge might discourage individuals from taking otherwise affordable loans on the basis of an inflated and erroneous calculation of the costs of that loan.

Again, the Court is not persuaded. Although an important purpose of TILA is to ensure that borrowers are not misled as to the costs of credit, *Thomka,* 619 F.2d at 248, it also operates to ensure "a *meaningful* disclosure of credit terms to enable consumers to compare readily the various credit terms available." *Rodash,* 16 F.3d at 1144 (emphasis added). This Court cannot find that a requirement that the borrower be informed of the yield spread premium would thwart the purpose of TILA. Rather, it finds that if a borrower is informed that a cost of credit includes a charge to be assessed by means of an increase in the approved interest

rate, the borrower will receive a more meaningful disclosure of the credit terms and will consequently be better able to compare the various credit terms available. Furthermore, it appears that the potential confusion regarding credit terms can be avoided by the creditor without great difficulty. As such, the potential for confusion does not present a basis for a finding that the present holding is in conflict with the purpose of TILA.

Finally, the Movants argue that recent FRB commentary supports their argument that the yield spread premium is not a finance charge. That commentary accompanies a revision to § 226.4(a)(3) of Regulation Z, which provided that "[f]ees charged by a mortgage broker ... are finance charges." The commentary, dated September 19, 1996, states that "fees paid by the funding party to a broker as a 'yield spread premium,' and already included in the finance charge as interest ... should not be double counted" in the computation of fees. FR 49238–39. Although the Court is cognizant of the weight that it must afford FRB opinions, *Milhollin*, 444 U.S. at 565, 100 S.Ct. at 796–97, it does not find that the commentary cited by the Movants leads this Court invariably to the conclusion proffered by the Movants. Section 226.4(a)(3) speaks to mortgage broker fees. Here, the Court has already found that Birmingham and Sterling are creditors under TILA. As such, the FRB commentary is not directly relevant to the determination at hand. In addition, the proper interpretation of the commentary is not entirely clear. While the commentary clearly indicates that interest and the yield spread premium should not be double-counted, it does not appear to require that the double-counting be avoided by a non-disclosure of the yield spread premium. Furthermore, as mentioned above, it appears to this Court that the double-counting problem may just as easily be avoided by separating out the yield spread premium from the interest rate approved by Fleet in the first instance.

■ While the Court finds that the yield spread premium is a finance charge under

TILA, it agrees with the Movants that it may not reasonably be viewed as a "prepaid finance charge."

In the Amended Complaint, the Plaintiffs allege that the Movants violated TILA by failing to include the yield spread premium in the itemization of the "amount financed" as a *prepaid* finance charge [10] in violation of 12 C.F.R. 226.18(c)(1). A prepaid finance charge is defined under Regulation Z as a "finance charge paid separately in cash or check before or at the consummation of a transaction, or withheld from the proceeds of credit anytime." 12 C.F.R. 226.2(a)(23).

The yield spread premium at issue in this case cannot be viewed as a prepaid finance charge. First, the Amended Complaint contains no allegation that the yield spread premium was paid by the borrowers before or at the consummation of the transaction or that it was withheld from the proceeds of credit. In addition, in the Plaintiffs' Response to the present Motion to Dismiss, they assert quite the opposite. They allege that the yield spread premium was paid by the Plaintiffs "in large *future* monthly payments." Thus, regardless of the fact that Fleet may have paid the yield spread premium to Birmingham and Sterling at the time the loan was consummated, the Plaintiffs' allege that they paid the yield spread premium over the life of the loan. Therefore, the Movants are entitled to dismissal of Count One under Rule 12(b)(6) to the extent that it alleges that Birmingham and Sterling violated TILA by failing to disclose the yield spread premium as a *prepaid* finance charge.

As an additional matter, it is unclear to the Court from the Amended Complaint and from the Plaintiffs' Response whether the Plaintiffs also allege in the Amended Complaint that the Movants violated TILA by failing to disclose the yield spread premium as a finance charge other than a prepaid finance charge. To the extent they do, the Court finds that such claims must nevertheless be dismissed due to the substantial lack of clarity in that allegation.

---

10. Regulation Z also requires that in each credit transaction the creditor disclose the "amount financed." 12 C.F.R. 226.18(c). That disclosure may be made in the form of a written itemization which includes, among others, an accounting of any "prepaid finance charge."

Furthermore, the Court finds that the Movants are also entitled to dismissal of Count One to the extent that it alleges in the alternative that Birmingham and Sterling violated TILA by "incorrectly disclosing optional information not required to be disclosed." As the Court has already held that the yield spread premiums at issue in this case were finance charges under TILA, a claim that rests upon an assumption that the disclosure of these charges was optional cannot be allowed to stand. As such, Count One is dismissed with prejudice to the extent that it alleges that Birmingham and Sterling violated TILA in this manner.

As a final matter, the Movants argue that the allegations in Count One involving loan servicing practices state a claim against Fleet only and must therefore be dismissed as against Birmingham and Sterling. The Court agrees that these allegations state a claim as against Fleet only, and the Plaintiffs do not dispute this characterization in their Response. However, the Court finds that there is no need to dismiss this claim as against Birmingham and Sterling, as it was not brought against those parties in the first instance.

In sum, the Court dismisses Count One in its entirety and with prejudice as against Express. As against Birmingham and Sterling, it dismisses Count One in part with prejudice and in part without prejudice. Specifically, it dismisses Count One with prejudice to the extent that it alleges that Birmingham and Sterling violated TILA by failing to disclose the yield spread premium as a prepaid finance charge and to the extent that it relies on an allegation that the yield spread premium was an optional disclosure. However, it dismisses Count One without prejudice to the extent that it alleges that Birmingham and Sterling failed to disclose the yield spread premium as a finance charge other than a prepaid finance charge. In so doing, it grants the Plaintiffs leave to restate that claim in Count One in the Second Amended Complaint due within fourteen days of the date of this Order.

## VI.

Count Two of the Amended Complaint arises under the Mortgage Act. The Plaintiffs allege and the Movants concede that the Movants are "licensees" under this Act.[11] The Plaintiffs claim that the Movants violated the Mortgage Act in three ways. Specifically, the Plaintiffs allege that the Movants violated § 1672 of the Act by

(i) failing to conduct their businesses in accordance with law, violating any other provision of the Act, or a rule promulgated or an Order issued under the Act;

(ii) engaging in fraud, deceit, or material misrepresentation in connection with any transaction governed by this Act; and

(iii) intentionally, or due to gross or wanton negligence, repeatedly failing to provide borrowers material disclosures of information as required by state or federal law.

M.C.L. § 445.1672.

The Movants argue that Count Two must be dismissed as against them because "there is no underlying violation of federal law, nor is there any fraud or failure to disclose." As the Plaintiffs pointed out in their Response and during the March 18 hearing on this Motion, this argument is premature. If any of the other Counts against the Movants were to withstand the present Motion to Dismiss, then Count Two must also be allowed to stand. Under the clear language of the Mortgage Act, if the Plaintiffs have successfully alleged that the Plaintiffs failed to conduct their businesses in accordance with the law, then they have also successfully alleged a violation of the Mortgage Act.

Because this Court has not dismissed all the other Counts as against the Movants, the Motion to Dismiss must be denied as to Count Two.

## VII.

At Count Four of the Amended Complaint, the Plaintiffs bring a claim against the Movants for unjust enrichment. This claim is stated in only vague terms in the

---

11. The Mortgage Act defines a "licensee" as "a mortgage broker, mortgage lender, or mortgage servicer licensed or required to be licensed under this act." M.C.L. § 445.1651a(g).

Amended Complaint; it provides only that the "Plaintiffs have alleged improper acts by Defendants by which they have recognized significant profits at Plaintiffs' expense." However, the Plaintiffs' Response to the present Motion indicates that the Plaintiffs are alleging that the Movants were unjustly enriched by their receipt of yield spread premiums in particular transactions.

 Under Michigan law, the elements of a claim for unjust enrichment are: (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to the plaintiff because of the retention of the benefit by the defendant. *Dumas v. Auto Club Insur. Ass'n*, 437 Mich. 521, 546, 473 N.W.2d 652 (1991); *Barber v. SMH (US), Inc.*, 202 Mich.App. 366, 375, 509 N.W.2d 791 (1993). When these elements are present, the law operates to imply a contract. *Barber*, 202 Mich.App. at 375, 509 N.W.2d 791. This implied contract does not require a meeting of the minds but is imposed by fiction of law to avoid unjust enrichment. *City National Bank v. Westland Towers Apartments*, 107 Mich.App. 213, 230, 309 N.W.2d 209 (1981). However, a contract will be implied only if (i) there is no express contract covering the same subject matter, *Barber*, 202 Mich.App. at 375, 509 N.W.2d 791; *Martin v. East Lansing School Dist.*, 193 Mich.App. 166, 177, 483 N.W.2d 656 (1992); *Kingsley Associates, Inc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 506 (6th Cir.1995); *Kuhfeldt v. Liberty Mutual Insur. Co.*, 833 F.Supp. 632, 636–37 (E.D.Mich. 1993); and (ii) if the controlling equities favor the party claiming to have been injured. *Westland*, 107 Mich.App. at 230, 309 N.W.2d 209. As such, the process of imposing a contract-in-law to prevent unjust enrichment is an activity which should be approached with some caution. *Dumas*, 437 Mich. at 546, 473 N.W.2d 652.

 The Movants claim that the unjust enrichment claim must be dismissed as against them for two reasons. First, they argue that under the facts presented in the Amended Complaint, the first factual prerequisite to an unjust enrichment claim—the receipt of a benefit by the defendant from the plaintiff—is not satisfied. The Movants argue that because the yield spread premium was paid by Fleet, that element is not present. Second, the Movants also argue that the claim must fail because even if the Plaintiffs had paid the yield spread premium, there was a contract in existence between the Movants and the Plaintiffs covering the fees associated with their respective loans. As such, the Movants argue that there were express contracts covering the same subject matter. The Plaintiffs respond by arguing again that the yield spread premium was paid indirectly by Fleet. Furthermore, they contend that there were no contracts covering the same subject matter because the contract terms did not speak specifically to the payment of a yield spread premium.

The Court cannot accept the Movants' first argument, as it has already ruled that the yield spread premiums were paid indirectly by the Plaintiffs. However, the Court is persuaded by the Movants' second argument. However, it finds that this argument succeeds in dismissing the unjust enrichment claim as against Birmingham and Sterling only. The unjust enrichment claim against Express must be allowed to stand.

Taking the facts presented in the Amended Complaint as true, Curtis entered into a loan contract with Birmingham and Myers–Berman entered into a loan contract with Sterling. Both of these contracts are alleged to have contained the terms of the loan, including the principal and the finance charges. Indeed, the Plaintiffs' TILA claim is based on the failure of the Movants to include the yield spread premium among the finance charges. As such, the Court finds that there were express contracts covering the subject matter of the finance charges on the loans. As the law is clear that "[t]here cannot be an express and implied contract covering the same subject matter at the same time," *Kuhfeldt*, 833 F.Supp. at 637, this Court finds that Count Four, as brought against Birmingham and Sterling, must fail.

In so finding, the Court rejects the Plaintiffs' assertion that the contracts at issue did not cover the subject matter encompassing the yield spread premium because they did not speak specifically to the payment of a yield spread premium. The term "subject

matter" is a broad term and arguments that particular items falling into that subject matter are not covered when not specifically named generally cannot be sustained. *See Aetna Casualty & Surety Co. v. Dow Chemical Co.*, 883 F.Supp. 1101, 1112 (E.D.Mich. 1995). As the court stated in *Aetna*, "[w]hile the Court may have to determine the intent of the parties to resolve individual questions not specifically addressed in the[ir] agreement, this does not mean that quasi-contract rules of unjust enrichment come into play for all such unsettled questions." 883 F.Supp. at 1112.

Thus, the Plaintiffs' unjust enrichment claim is dismissed with prejudice as against Birmingham and Sterling. However, as the pleadings before the Court do not make clear whether Express was party to the contract between Sterling and Myers–Berman or whether it received any part of the yield spread premium paid by Myers–Berman, it would be premature to dismiss Plaintiffs' unjust enrichment claim against Express.

## VIII.

At Count Eight of the Amended Complaint, the Plaintiffs allege that the Movants committed gross negligence in their dealings with the Plaintiffs. Specifically, they allege that the Movants "obscured the true nature of the financial transaction with the Plaintiffs, mishandled the loan application and approval process, failed to supervise and control certain of their employees who actually performed the wrongful acts complained of in this Complaint, failed to use diligence as to these loans, and abused their positions of trust." In support of this claim they assert that the Movants, as licensed brokers, lenders, and servicers, had a "legal duty to the Plaintiffs to act in the manner expected of a specialist in the lending or financial services field."

The Movants argue that this negligence claim fails because the Plaintiffs do not allege that the Movants had a duty outside of their contractual agreements. The Court does not fully understand this argument, as the assertions made in this Count all relate to the Movants' conduct before the loan agreements were executed; that is, they relate to conduct

associated with the processing and origination of the loans by the Movants. Indeed, this must be the case, as the Plaintiffs allege in the Amended Complaint that the loan contracts were immediately assigned to and performed entirely by Fleet. In fact, the Plaintiffs exclude the Movants from their breach of contract claim.

Thus, the question becomes whether Michigan recognizes that a licensee under the Mortgage Act owes a duty to those from whom it accepts loan applications to act with care in processing their applications. Indeed, as in any negligence action, "the threshold question ... is whether the defendant owed a legal duty to the plaintiff." *Bell & Hudson, P.C. v. Buhl Realty Co.*, 185 Mich.App. 714, 717, 462 N.W.2d 851 (1990). The question as to whether such a duty exists is generally for the court to decide. *Id.*

Although the Plaintiffs have cited law from states other than Michigan that suggests that a lender in some instances will be held to owe a duty of care to a loan applicant, there does not appear to be analogous law in Michigan that would suggest that either a lender or broker has such a duty. In fact, the Michigan Court of Appeals took notice of such law in *Ulrich v. Federal Land Bank*, 192 Mich.App. 194, 480 N.W.2d 910 (1991). The court in *Ulrich* was presented with the question of "whether the defendant [bank] had a legal duty to exercise reasonable care in determining plaintiff's eligibility for a loan." 192 Mich.App. at 199, 480 N.W.2d 910. It held that no such duty exists, and dismissed the plaintiffs' negligence claim against their lender. Although the facts and indeed the precise issues in *Ulrich* are distinguishable from the case at hand, *Ulrich* is the only guidance available to this Court in considering whether the negligence claim the Plaintiffs assert may be pursued under Michigan law. It does not appear that it may. In fact, in addressing this issue, the court in *Ulrich* stated that "[w]e are aware of cases from other jurisdictions .... that impose a duty of reasonable care on lending institutions in processing loan applications." 192 Mich.App. at 198, 480 N.W.2d 910. It does

not appear that Michigan has chosen to follow the lead of those other states. This Court, ruling on a question of Michigan state law, will not take a path that the Michigan courts appear to have bypassed.

Therefore, Count Eight is dismissed with prejudice as against the Movants.

## IX.

At Count Eleven of the Amended Complaint, the Plaintiffs assert that the loan agreements were themselves unconscionable. They claim that they had been unable to obtain loans from other lenders, that they had "no alternatives to borrowing" from the Movants, and that they were desperate and naive. They therefore claim that the Movants had the superior bargaining position and that they used that position to obtain unconscionable loan terms. The Plaintiffs ask this Court to void the unconscionable contract terms.

The Movants, rather than attacking the substance of the unconscionability claim, argue that this Count must be dismissed as against them because the Plaintiffs seek no relief from the Movants under this Count. In short, they point out that by the Plaintiffs' own admission, the loans were immediately assigned from the Movants to Fleet and that Fleet now holds the right to enforce those loan agreements. As such, any ruling from this Court that would declare that particular contract terms are unenforceable would necessarily be directed against Fleet rather than the Movants. As such, they assert that they must be dismissed from these claims.

The Court finds this argument compelling and notes that the Plaintiffs fail to refute it in their Response to the Motion. As such, Count Eleven is dismissed with prejudice as against the Movants.

## X.

At Count Thirteen, the Plaintiffs allege that the Movants committed common law fraud. Specifically, they claim that the Movants materially misrepresented the amount of their fees, the fact that they were acting as brokers for both Fleet and the Plaintiffs (i.e., as dual agents), the fact that Fleet was the "true creditor," and so forth.

The elements constituting common law fraud are firmly established under Michigan law. To establish fraud a plaintiff must show:

(i) that [the] defendant made a material misrepresentation; (ii) that it was false; (iii) that when [the] defendant made it he knew that it was false, or made recklessly, without any knowledge of its truth and as a positive assertion; (iv) that [the] defendant made it with the intention that it should be acted upon by [the] plaintiff; (v) that [the] plaintiff acted in reliance upon it; and (vi) that [the] plaintiff thereby suffered injury.

*Hi-Way Motor Co. v. Int'l Harvester Co.*, 398 Mich. 330, 336, 247 N.W.2d 813 (1976). Fraud must be proven by "clear, satisfactory, and convincing evidence," and cannot be established by a mere preponderance of the evidence. *Id.*

In addition, Rule 9(b) applies to this claim. Rule 9(b) provides that

[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind may be averred generally.

The Movants do not raise a Rule 9(b) argument; rather, they make a general argument that the Plaintiffs' fraud claims "are barred by the language in the agreements and loan documents signed by the Plaintiffs, which all comply with TILA and other federal and state statutes which regulate these transactions." This argument cannot support a dismissal of the Plaintiffs' common law fraud claims. The Plaintiffs appear to argue that the loan documents signed by them and the statements made to them during the loan transactions were all intended to conceal the fact that the Movants were in fact acting as brokers rather than lenders. As indicated earlier, it remains to be determined as a matter of Michigan law whether the Movants acted as lenders or brokers in

the context of this case.[12] Thus, the question of whether the Movants made material misrepresentations as to that fact must also remain.

Therefore, the present Motion to Dismiss is denied as to Count Thirteen.

## XI.

### A.

In summary, as stated on the record and for the reasons stated from the bench:

(1) The Motion to Dismiss is granted as to Count Three of the Amended Complaint. As such, Count Three, brought under the MCPA, is dismissed with prejudice as against the Movants.

(2) The Motion to Dismiss is granted as to Count Five. As such, Count Five, the Plaintiffs' civil conspiracy claim, is dismissed without prejudice as against the Movants.

(3) The Motion to Dismiss is denied as to Count Nine, the Plaintiffs' breach of fiduciary duty claim.

(4) The Motion to Dismiss is granted as to Count Ten. As such, Count Ten, the Plaintiffs, claim under the "shingle theory" of liability, is dismissed with prejudice as against the Movants.

(5) The Motion to Dismiss is granted as to Counts Fourteen through Nineteen. Counts Fourteen through Nineteen, brought under RICO, are dismissed without prejudice as against the Movants.

(6) The Plaintiffs are permitted fourteen days from the date of this Memorandum Opinion and Order to file a Second Amended Complaint solely for the purpose of restating those Counts dismissed without prejudice from the bench.

(7) The Plaintiffs concede that they bring no cause of action against the Movants under Counts Six, Seven, and Twelve.

### B.

Furthermore, for the reasons set forth in this Memorandum Opinion and Order:

(1) The Motion to Dismiss is granted as to Count One, the Plaintiffs' claim under TILA. Specifically, Count One is dismissed (i) with prejudice as to Express and (ii) in part with prejudice and in part without prejudice as to Birmingham and Sterling.

(2) The Motion to Dismiss is denied as to Count Two, the Plaintiffs' claim arising under the Mortgage Act.

(3) The Motion to Dismiss is granted in part and denied in part as to Count Four. Specifically, Count Four, the Plaintiffs' unjust enrichment claim, is dismissed with prejudice as against Birmingham and Sterling and denied as against Express.

(4) The Motion to Dismiss is granted as to Count Eight. As such, Count Eight, the Plaintiffs' gross negligence claim, is dismissed with prejudice as against the Movants.

(5) The Motion to Dismiss is granted as to Count Eleven. As such, Count Eleven, the Plaintiffs' unconscionability claim, is dismissed with prejudice as against the Movants.

(6) The Motion to Dismiss is denied as to Count Thirteen, the Plaintiffs' common law fraud claim.

**IT IS SO ORDERED.**

---

12. This Court does not find that this conclusion conflicts with its earlier finding that Birmingham and Sterling are "creditors" under TILA.