Sandra **VANDENBROECK**, an individual, Eugene and Carol Nichoson, husband and wife, Abel and Denise Soto, husband and wife, Plaintiffs and Class Representatives,

v.

**COMMONPOINT MORTGAGE COMPANY**, d/b/a Commonpoint Mortgage, f/k/a AAA Mortgage and Finance, f/k/a Allstate Mortgage and Financial Corp., f/k/a Anderson Realty, Inc., a Michigan corporation, and Michael Anderson, an individual, Defendants.

No. 1:97–CV–826.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 13, 1998.

John E. Anding, Drew, Cooper & Anding, Grand Rapids, MI, for Plaintiffs.

Jacqueline D. Scott, Deborah I. Ondersma, Varnum, Riddering, Schmidt & Howlett, Grand Rapids, MI, John C. Englander, James W. McGarry, David L. Permut, Thomas M. Hefferon, Goodwin, Procter & Hoar, LLP, Boston, MA, John E. Jacobs, Mason, Steinheardt & Jacobs, Southfield, MI, for Defendants.

## OPINION

QUIST, District Judge.

This action is brought by several individuals who obtained residential mortgage loans from Defendant CommonPoint Mortgage Company ("CommonPoint").[1] Plaintiffs allege that in making the loans, CommonPoint reaped excessive profits through a scheme in which it charged "excessive fees ... that [were] undisclosed, unearned or not bona fide." (2d Am.Compl.¶ Introduction.) Plaintiffs filed this action on behalf of themselves and others similarly situated against CommonPoint and its sole shareholder and director, Michael Anderson. Plaintiffs' second amended complaint alleges a claim in Count II under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 to 1968, a claim in Count IV under the Truth In Lending Act ("TILA"), 15

---

1. CommonPoint formerly conducted business as AAA Mortgage and Finance, Allstate Mortgage and Financial Corp., and Anderson Realty, Inc. (See 2d Am. Compl. ¶ 3.) For purposes of clarity, the Court will refer to CommonPoint at all points in time by its current name.

U.S.C. §§ 1601 to 1667f,[2] and seeks to invoke the Court's supplemental jurisdiction under 28 U.S.C. § 1367 over its state law claims for violation of the Michigan Consumer Protection Act ("MCPA"), M.C.L. §§ 445.901 to .922 in Count I, breach of fiduciary duty in Count V, and unjust enrichment in Count VI. Now before the Court are Defendants' motions to dismiss Counts I, II, IV, and VI of the second amended complaint, and Plaintiffs' motion for leave to file third amended complaint.[3]

### Facts

CommonPoint is a mortgage company that is primarily engaged in making mortgage loans to borrowers who, for reasons such as a poor credit history or lack of sufficient or verifiable income, have difficulty obtaining financing. Plaintiffs, Sandra VanDenBroeck, Eugene and Carol Nichoson, and Abel and Denise Soto, sought and obtained mortgage loans from CommonPoint as a means of obtaining additional cash or reducing the interest rate and/or monthly payment under their existing mortgages. As part of the loan process, CommonPoint had Plaintiffs sign a CommonPoint form agreement called a "Financial Services Agreement" (the "FSA") at or shortly after the initial meeting. The FSA provided, in part:

> 1. CLIENT retains [CommonPoint] as CLIENT'S agent for 180 days from the date hereof to use its best efforts to obtain a loan ("Loan") on substantially the following terms . . . .

> \* \* \* \* \* \*

> 3. IF a commitment for a Loan is issued to CLIENT by a third party, CLIENT shall pay to [CommonPoint] a fee equal to the greater of *[%]* % of the original principal amount of the Loan or *$[$]* . . . .

> \* \* \* \* \* \*

> 5. NOTWITHSTANDING anything contained in this Agreement to the con-

trary, if [CommonPoint] issues a commitment to CLIENT to make the loan, [CommonPoint] shall no longer be acting on behalf of CLIENT and [CommonPoint] shall not be deemed to be the agent of CLIENT. . . .

(FSA ¶¶ 1, 3, 5, attached to 2d Am. Compl. as Ex. D.) Instead of seeking out loans from third parties, CommonPoint made the loans itself.

At closing, CommonPoint charged Plaintiffs loan discount fees ranging from $1,300 to $3,150 without providing discounts on the interest rates. Instead, Plaintiffs allege, CommonPoint inflated the interest rates on the loans above interest rates at which the loans could have been made. After closing all of the loans, CommonPoint sold them to an end lender for a fee referred to as the "upsell" or "back end fee," which was based upon the difference between CommonPoint's loan rate and the end lender's rate. CommonPoint disclosed to Plaintiffs that their loans might be transferred to another lender for servicing, but did not disclose the existence of the "upsell". The interest rates or monthly payments on the loans which Plaintiffs ultimately obtained from CommonPoint exceeded the rates or amounts which CommonPoint originally promised. Plaintiffs allege that CommonPoint engaged in improper conduct by, among other things, failing to disclose to Plaintiffs that the loans were made at interest rates which exceeded the rates at which they could have been made and charging loan discount fees on loans that were not discounted.

### Standard For Dismissal

An action may be dismissed if the complaint fails to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). The moving party has the burden of proving that no claim exists. Although a complaint is to be liberally construed, it is still necessary that the complaint contain more than bare assertions of legal conclusions. *Allard v. Weitzman (In re DeLorean Motor Co.)*, 991

---

**2.** Count III, which alleged a claim under TILA by Plaintiffs Maria and Juan Garcia, was previously dismissed by stipulation of the parties. Therefore the Garcias are no longer plaintiffs in this case.

**3.** Plaintiffs' motion for class certification is also pending before the Court.

F.2d 1236, 1240 (6th Cir.1993)(citing *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir.1988)). All factual allegations in the complaint must be presumed to be true, and reasonable inferences must be made in favor of the non-moving party. 2A James W. Moore, *Moore's Federal Practice*, ¶ 12.34[1][b] (3d ed.1997). The Court need not, however, accept unwarranted factual inferences. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir.1987). Dismissal is proper "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984)(citing *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957)).

## Discussion

## I. Federal Claims

### A. RICO

■ In Count II, Plaintiffs allege that Defendants violated RICO by committing mail and wire fraud. Plaintiffs' RICO claim is based upon 18 U.S.C. § 1962(c), which provides, in relevant part, that:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

To establish a violation of § 1962(c), a plaintiff must prove " '(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.' " *Central Distrib. of Beer, Inc. v. Conn*, 5 F.3d 181, 183 (6th Cir.1993)(quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985)). Defendants contend that Plaintiffs' RICO claim must be dismissed because Plaintiffs have failed to allege facts showing the existence of a RICO enterprise or that Defendants exerted control over the alleged enterprise and because Plaintiffs have failed to adequately allege that Defendants committed the predicate acts of mail and wire fraud.

### 1. Enterprise

■ An enterprise is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). An enterprise can be either a legal entity, such as a corporation, or an association-in-fact. *See Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir.1995) (citation omitted). In *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the Supreme Court defined an association-in-fact as "a group of persons associated together for a common purpose of engaging in a course of conduct." 452 U.S. at 583, 101 S.Ct. at 2528. In this case, Plaintiffs allege that the RICO enterprise was an association-in-fact consisting of "CommonPoint and the investors and lenders who purchase[d] the loans originated and/or sold by CommonPoint." (2d Am.Compl.¶ 115.) The existence of an enterprise "is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. at 2528.

■ To constitute a RICO enterprise, an association-in-fact: (1) "must be an ongoing organization"; (2) "its members must function as a continuing unit"; and (3) "it must be separate from the pattern of racketeering activity in which it engages." *Frank v. D'Ambrosi*, 4 F.3d 1378, 1386 (6th Cir. 1993)(per curiam)(citing *Turkette* ); *see also United States v. Davidson*, 122 F.3d 531, 534 (8th Cir.1997)(*Turkette* factors include "whether the alleged enterprise has common or shared purposes, some continuity of structure and personnel, and a structure distinct from that inherent in the alleged pattern of racketeering activity"), *cert. denied*, — U.S. ——, 118 S.Ct. 1329, 140 L.Ed.2d 490 (1998). The "ongoing organization" requirement is coextensive with the existence of organizational structure.

> To satisfy [the ongoing organization] element, the [plaintiff] must show that some sort of structure exists within the group for the making of decisions, whether it be hierarchical or consensual. There must be

some mechanism for controlling and directing the affairs of the group on an on-going, rather than an ad hoc, basis. This does not mean that every decision must be made by the same person, or that authority may not be delegated.

*United States v. Riccobene*, 709 F.2d 214, 222 (3d Cir.1983), *overruled on other grounds*, *Griffin v. United States*, 502 U.S. 46, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991); *see also Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 645 (7th Cir.1995). Structure is "[t]he hallmark of an enterprise." *United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir.1996) (citation omitted), *cert. denied*, —— U.S. ——, 117 S.Ct. 495, 136 L.Ed.2d 387 (1996). The requirement of structure "ensure[s] that RICO's severe penalties are limited to 'enterprises consisting of more than simple conspiracies to perpetrate the predicate acts of racketeering.'" *Davidson*, 122 F.3d at 534 (quoting *United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.1982)). However, while "there must be some structure, ... there need not be much." *Burdett v. Miller*, 957 F.2d 1375, 1379 (7th Cir.1992).

■ As noted above, Plaintiffs allege that CommonPoint formed an association-in-fact with the investors and lenders who purchased the loans made by CommonPoint "for the purposes of marketing, underwriting, making and then selling mortgage financing." (2d Am.Compl.¶ 115.) Plaintiffs contend that they have met their burden of pleading that the alleged enterprise had some sort of organizational structure through their allegations describing the mortgage underwriting process that occurred between CommonPoint and its end lenders or investors in which: (1) CommonPoint obtained the borrower; (2) the end lender determined the interest rate at which the loan could be made to the borrower; (3) CommonPoint determined the "note" rate at which it made the loan to the borrower based upon the interest rate established by the end lender; and (4) CommonPoint sold the note to the end lender and obtained a back end fee. (Pls.' Resp. Br. at 33–34 (citing 2d Am. Compl. ¶¶ Introduction (d), 27, 60, 70, 110(m)).)

■ These allegations are insufficient to establish a RICO enterprise, however, because they do not show that the alleged association-in-fact exhibited any sort of decisionmaking mechanism for conducting the group's affairs. At most, the allegations show that CommonPoint had a business relationship with end lenders and investors who provided funding which enabled CommonPoint to generate loans to its borrowers. What Plaintiffs allege is a typical business relationship in which two or more parties rely upon each other to achieve separate, but dependent, economic benefits. There is no allegation, even in conclusory form[4], showing that "an organizational pattern or system of authority ... provide[d] a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis." *United States v. Kragness*, 830 F.2d 842, 856 (8th Cir.1987) (citations omitted); *see also Delta Truck & Tractor, Inc. v. J.I. Case Co.*, 855 F.2d 241, 244 (5th Cir.1988)(finding that alleged racketeering activity was "nothing more than numerous predicate acts which were necessary segments of an otherwise legitimate and singular commercial endeavor"). In other words, Plaintiffs' alleged enterprise is nothing more than the sum of its parts; there is no allegation that CommonPoint directed or influenced decisions made by its end lenders and investors or vice versa, nor do Plaintiffs allege that any specific act was performed by the alleged group in furtherance of an agreed-upon goal. *See Schmidt v. Fleet Bank*, 16 F.Supp.2d 340, 349 (S.D.N.Y.1998)(finding plaintiffs allegations insufficient to support RICO enterprise where plaintiffs did not allege "any kind of chain of command or functional integration" and participation in alleged fraudulent

---

4. While Plaintiffs are not required to meet the requirements of Fed.R.Civ.P. 9(b), they may not rely upon "mere conclusory allegations [to] establish the existence of an enterprise." *Elliott v. Foufas*, 867 F.2d 877, 881 (5th Cir.1989) (citations omitted); *see also O'Rear v. American Family Life Assurance Co.*, 139 F.R.D. 418, 422 (M.D.Fla.1991)(ordering plaintiff to provide to defendant, in connection with plaintiff's third amended complaint, statement of facts establishing that association-in-fact, if alleged, had common or shared purpose and continuity of structure, and describing "structure, purpose, function, and course of conduct of the enterprise").

scheme was only common factor linking defendants to each other); *Bernstein v. Misk,* 948 F.Supp. 228, 235 (E.D.N.Y.1997)(mem.op.)(holding plaintiffs' allegation that defendants and others constituted association-in-fact insufficient to establish organization functioning as continuous unit as required by *Turkette* ); *cf. Goss v. Alliance Mortgage Co.,* No. 95 C 7324, 1997 WL 119918, at *2 (N.D.Ill. Mar.14, 1997)(mem.op.)(holding that alleged association-in-fact consisting of federal mortgage associations and their servicing agents was not RICO enterprise because plaintiffs failed to allege "system of authority that guided the operation of the alleged enterprise" and form mortgages required by governmental agencies did not act as "directives in a hierarchical decisionmaking process").

Plaintiffs cite *Kerby v. Mortgage Funding Corp.,* 992 F.Supp. 787 (D.Md. 1998)(mem.op.), which they contend is "on all fours," as support for their alleged RICO enterprise. In *Kerby,* the plaintiffs alleged that the defendants violated the Real Estate Settlement Procedures Act of 1974, TILA, and RICO, and committed various state law torts, in connection with an alleged mortgage refinancing scheme. *See* 992 F.Supp. at 790. Under the alleged scheme, defendant Mortgage Funding Corporation, a mortgage broker, promised the plaintiffs the lowest mortgage refinancing rate possible. Defendant Severn Savings Bank, F.S.B. provided initial funding for the plaintiffs' loan, but transferred the loan after fourteen days to defendant Countrywide Funding Corporation, to whom it was pre-sold. Each of the defendants received certain payments as part of the transaction pursuant "to an internal Severn document entitled 'Funding Detail.'" *Id.* at 791.

In ruling on the defendants' motions to dismiss the RICO claim, the court stated: the [plaintiffs] have alleged how Severn was involved, and have produced the previously described internal Severn "Funding Detail" showing the payments from Countrywide to Severn to Mortgage Funding. This is far from a conclusory allegation of association; it shows money actually changing hands in an undisclosed transaction, the cost of which was to be unknowingly paid by the borrower over time in the form of a higher interest rate.

*Id.* at 800 (internal citation omitted). Plaintiffs contend that the *Kerby* court's observations validate their RICO enterprise in this case.

Plaintiffs' reliance on *Kerby* is misplaced because the issue addressed in *Kerby* was whether the plaintiffs had pled the predicate act—mail fraud—against each of the defendants with sufficient particularity under Fed. R.Civ.P. 9(b). *See id.* at 799–803. The court did not address whether the plaintiffs had sufficiently pled the existence of a RICO enterprise. Thus, *Kerby* provides no guidance on the enterprise issue raised in this case. *Kerby* is also distinguishable from this case on a more fundamental basis. The enterprise alleged by the *Kerby* plaintiffs consisted of a broker, title company, lender, and secondary market purchaser, which the plaintiffs identified by name and specific role in the alleged fraud. Here, the enterprise consists of CommonPoint, Anderson, and all of the end-lenders and investors with whom CommonPoint does business. These facts do not compare with those alleged in *Kerby*.[5]

 In addition to being an ongoing organization with a decisionmaking mechanism, an enterprise must exist apart from the acts of racketeering in which it is allegedly engaged. *Frank,* 4 F.3d at 1386. The Court in *Turkette* held that the enterprise and the pattern of racketeering activity are *not* one and the same. *Turkette,* 452 U.S. at 583, 101 S.Ct. at 2529. "While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other." *Id.* "[A]lthough a pattern of racketeering activity may be the means through which the enterprise interacts with society, it is not itself the

---

5. Given the broad and open-ended nature of the alleged enterprise, it could reasonably be expected that a control mechanism for directing the affairs of the enterprise would exist among the various end lenders and investors, as well as between CommonPoint and its end lenders and investors. However, the second amended complaint alleges no facts demonstrating that there was any coordination of activities among those alleged group members.

enterprise, for an enterprise is defined by what it is, not what it does." *Jennings v. Emry,* 910 F.2d 1434, 1440 (7th Cir.1990). The enterprise must exist apart from the predicate acts, although it need not conduct a "function wholly unrelated to the racketeering activity." *Riccobene,* 709 F.2d at 223–24.

The Court finds no allegation in Plaintiffs' second amended complaint that demonstrates the existence of an enterprise separate and apart from the alleged pattern of racketeering. Based upon its reading of Plaintiffs' second amended complaint, the Court understands Plaintiffs' claim to be that CommonPoint committed the predicate acts of charging a loan discount fee without providing a discounted interest rate and failing to disclose that the loans were made at inflated interest rates. Plaintiffs do not allege facts that differentiate the alleged enterprise from the predicate acts themselves. *See Crowe,* 43 F.3d at 205 (holding that alleged farming venture enterprise existed apart from pattern of racketeering where joint venture shielded venturer's assets, operated farming business, produced and sold crops, and purchased farming equipment). The entire enterprise alleged by Plaintiffs thus consists of nothing more than the alleged fraudulent acts.

### 2. Participation

To establish a RICO violation, a plaintiff must show that the defendant conducted or participated in, "directly or indirectly, [ ] the conduct of [the] enterprise's affairs." 18 U.S.C. § 1962(c). The Supreme Court has made clear that only persons who "participate in the operation or management of the enterprise itself" can be held liable for RICO violations under § 1962(c). *Reves v. Ernst & Young,* 507 U.S. 170, 185, 113 S.Ct. 1163, 1173, 122 L.Ed.2d 525 (1993). "[L]iability depends on showing that the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs." *Id.* (italics in original); *accord Stone v. Kirk,* 8 F.3d 1079, 1090–91 (6th Cir.1993)(citing *Reves* )(the defendant did not participate in the operation or management of the RICO enterprise even though he was

associated with it as a sales representative and engaged in racketeering activity).

In *Eby v. Producers Co-op, Inc.,* 959 F.Supp. 428 (W.D.Mich.1997), the court held that the plaintiff failed to state a RICO claim where the complaint merely alleged that the defendant " 'directly or indirectly participated in the affairs of' " the plaintiff's farming operation—the alleged RICO enterprise. 959 F.Supp. at 432. The court found nothing in the complaint beyond the plaintiff's conclusory allegations to suggest that the defendant engaged in directing the plaintiff's farming operation. *Id.* In similar fashion, Plaintiffs in this case have only alleged that the Defendants, "while associated with the enterprise, participated in the conduct of the affairs of the enterprise." (2d Am. Compl.¶ 116.) Beyond this naked allegation of participation by Defendants, Plaintiffs have not alleged any specific fact showing that CommonPoint or Anderson participated in conducting the alleged enterprise's affairs. To the extent the second amended complaint alleges that Defendants participated in the conduct of any affairs, those allegations show only that Defendants were engaged in conducting CommonPoint's affairs in arranging loans for its customers rather than conducting the affairs of an alleged enterprise. Therefore, dismissal is also proper because Plaintiffs have not alleged the requisite participation by Defendants.

### 3. Predicate Acts

Defendants have also raised a number of arguments regarding the sufficiency of Plaintiffs' predicate acts allegations. Because the Court has already concluded that the RICO claim must be dismissed because Plaintiffs have not alleged the existence of an enterprise or the requisite participation by Defendants in the alleged enterprise's affairs, the Court finds no reason to address these arguments. Furthermore, some of the arguments raised by Defendants may raise state law issues which should be left for the state court to decide.

### B. TILA Claim

In Count IV of the second amended complaint, Plaintiffs allege that CommonPoint

violated the TILA by failing to disclose the back end or upsell fees that CommonPoint received from the end lenders who purchased the loans from CommonPoint. While Plaintiffs do not expressly allege as much, the Court understands Plaintiffs' claim to be that CommonPoint should have disclosed the back end fee as a separate item in the finance charge section of the TILA disclosure statement. (*See* 2d Am. Compl. ¶¶ 129–30) (restating definition of "finance charge" under 15 U.S.C. § 1605(a).) CommonPoint contends that Count IV should be dismissed because the back end fee, which was based upon the difference between CommonPoint's interest rate and the end lender's rate, was disclosed as interest paid over the life of the loan in the "Finance Charge" section of the TILA disclosure statement.

The TILA specifies a list of fourteen items which a creditor must disclose to a borrower in a consumer transaction. *See* 15 U.S.C. § 1638(a)(1)—(14). In particular, a creditor is required to disclose "[t]he 'finance charge', not itemized, using that term." 15 U.S.C. § 1638(a)(3). The "finance charge" is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605(a); *see also* 12 C.F.R. § 226.4(a). Under Regulation Z, promulgated by the Federal Reserve Board pursuant to TILA, a creditor must indicate "[t]he *finance charge*, using that term, and a brief description such as 'the dollar amount the credit will cost you.'" 12 C.F.R. § 226.18(d)(emphasis in original).

█ The Court finds Plaintiffs' claim without merit. Plaintiffs allege that CommonPoint charged them higher interest rates and obtained back-end fees based upon the increased rates when they sold the loans to end lenders or investors. The increased amount of interest was disclosed to Plaintiffs as part of the finance charge figure. The TILA and Regulation Z both require only that the creditor show the total dollar amount of financing to be paid by the borrower. Separate disclosure of fees, such as the back end fee at issue in this case, is not even permitted when the fees are reflected as part of the finance charge. *See* 15 U.S.C. § 1638(a)(3). The Federal Reserve Board advises creditors against "double count[ing]" fees such as yield spread premiums paid to mortgage brokers which are "already included as part of the finance charge." 61 Fed. Reg. 49238–39 (1996). Although CommonPoint did not act as a broker and the back end fees at issue were not yield spread premiums, the Court finds no reason for not applying the same rule to fees which are otherwise reflected in the finance charge. Because the TILA expressly prohibits creditors from itemizing the finance charge, CommonPoint was not required to disclose the back end fee as a separate figure.

Plaintiffs rely on the following quote from Judge Gilmore in *Noel v. Fleet Finance, Inc.*, 971 F.Supp. 1102 (E.D.Mich.1997)(mem.op.) as support for their argument that CommonPoint's disclosure of the back end fee as part of finance charge was impermissible:

The Court is not persuaded by these arguments. First, the Movants have failed to demonstrate that TILA allows for finance charges of any kind to be disclosed to a borrower "indirectly." Indeed, the purpose of TILA was to mandate "clear and conspicuous" disclosures of the cost of credit. As such, the Court declines to accept the Movants' argument that Birmingham and Sterling met their obligations to disclose the yield spread premium through the disclosure of the increased interest rate. The Court is similarly not persuaded by the Movants' argument that the Plaintiffs were not entitled to knowledge of Birmingham and Sterling's profits from the transactions. Although this argument may carry more weight in the context of the retail transactions that the Movants discuss, TILA was enacted precisely to allow for in-depth financial disclosures in credit transactions.

971 F.Supp. at 1111. While Judge Gilmore's observations, in isolation, would appear to lend some support to Plaintiffs' argument, the plaintiffs' claim in *Noel* differed from Plaintiffs' claim in this case. The *Noel* plaintiffs alleged that the defendants violated the TILA by not itemizing the yield spread pre-

mium in the *amount financed* section of the TILA disclosure statement, rather than by not disclosing the fee as a separate finance charge, as alleged in this case. *See id.* at 1112. Although Judge Gilmore found that the yield spread premium was a finance charge, he concluded that it was not a prepaid finance charge that was required to be disclosed and dismissed the claim. *See id.* In addition, due to "substantial lack of clarity" in the complaint, Judge Gilmore dismissed any claim that the defendants violated the TILA by not disclosing the yield spread premium as a finance charge, but granted the plaintiffs leave to restate that claim in a second amended complaint. *Id.*

The *Noel* case was subsequently reassigned to Judge Borman, who recently granted the defendants summary judgment on the plaintiffs' claim that the yield spread premium should have been disclosed as a separate finance charge. (*See Noel v. Fleet Finance, Inc.,* No. 95–73457, slip op. (E.D.Mich. Aug. 20, 1998), Defs.' Suppl. Br. Ex. A.) Judge Borman concluded, as this Court does, that the TILA does not require a lender to

> disclose the separate existence of the [back end fee] as a component of the finance charge. Indeed, to disclose separately the yield spread premium and/or the other components of the finance charge would violate Federal Reserve Board regulations by presenting the consumer with confusing multiple figures, rather than the required lump-sum finance charge.

(*Id.* at 12.)[6] Plaintiffs have thus failed to state a viable TILA claim.

### C. Plaintiffs' Proposed Claims

By Order dated August 14, 1998, this Court granted Plaintiffs' motion for a partial lift of the stay on discovery to complete the deposition of Barb Lamb in light of Ms. Lamb's allegations in her motion to inter-

vene. The Court also granted Plaintiffs the opportunity to file supplemental briefs regarding the effect of Ms. Lamb's testimony, if any, on the pending motion to dismiss and motion to certify class. Plaintiffs completed Ms. Lamb's deposition and filed a motion for leave to file a third amended complaint.

In the instant motion, Plaintiffs seek leave to file a third amended complaint in order to: (i) add a new claim under the Truth In Lending Act which they claim was inspired by Ms. Lamb's testimony; (ii) supplement their claim under the MCPA; and (iii) supplement their second amended complaint to address any pleading defects in their second amended complaint. Pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, leave to amend a complaint "shall be freely given when justice so requires." Fed. R.Civ.P. 15(a).

> Several elements may be considered in determining whether to permit an amendment. Undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment are all factors which may affect the decision. Delay by itself is not sufficient reason to deny a motion to amend. Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted.

*Head v. Jellico Hous. Auth.,* 870 F.2d 1117, 1123 (6th Cir.1989)(quoting *Hageman v. Signal L.P. Gas, Inc.,* 486 F.2d 479, 484 (6th Cir.1973)); *see also Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 489 F.2d 968, 970 (6th Cir.1973)(citing *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962)).

---

**6.** The fact that the fee at issue in *Noel* was a yield spread premium is not a material distinction, as that fee and the back end fee in this case were disclosed as part of the total finance charge. In his opinion, Judge Borman cited *Baldwin v. Laurel Ford Lincoln–Mercury, Inc.,* No. 2:97cv245GR, slip op. (S.D.Miss. May 29, 1988) (mem.op.) in support of his conclusion that the TILA did not require separate disclosure of the yield spread premium. In *Baldwin,* the plaintiff,

who had purchased a car from the defendant dealership, alleged that the defendant violated the TILA by failing to disclose a commission based upon the interest charged in the finance contract. *Baldwin,* slip. op. at 2. The court held that the defendant did not violate the TILA by failing to separately itemize the commission as a finance charge because the TILA only requires disclosure of the total dollar amount of the finance charge. *Id.* at 14–15.

■ Based upon its review of the record, the Court finds that while the claims which Plaintiffs now seek to add should have been apparent to Plaintiffs, without Ms. Lamb's testimony, several months prior to the time they filed their motion, the delay is not so substantial that Defendants will be prejudiced if the amendment is granted. Plaintiffs filed their motion less than a year after they filed their original complaint, before the close of discovery and well before the date set for trial. Under these circumstances the Court cannot conclude that delay should preclude amendment. *See Security Ins. Co. of Hartford v. Kevin Tucker & Assoc., Inc.*, 64 F.3d 1001, 1009 (6th Cir.1995)(holding that district court abused its discretion in denying amendment, even though sixteen months had passed, because no prejudice had been shown and discovery cut-off and trial dates had not been set). Thus, at least in the circumstances presented in this case, Plaintiffs' delay alone does not preclude amendment.

The Court also finds that Defendants have not shown that they would be prejudiced if Plaintiffs' proposed amendments are allowed. Defendants have not demonstrated an inability to defend the claims. *See id.* Furthermore, while Defendants surmise that Plaintiffs will likely seek further discovery, their assertion of additional burdensome discovery is refuted by their argument that Plaintiffs' new claims were apparent on the face of the loan documents attached to their original complaint. In other words, Plaintiffs' new claims can be determined, in large part, from documents already produced. The Court finds nothing to suggest that the new claims will require a substantial amount of additional discovery.

■ Notwithstanding the absence of undue delay and/or prejudice, the Court must still review Plaintiffs' proposed claims to determine whether they would be futile. *See Bower v. Jones*, 978 F.2d 1004, 1008 (7th Cir.1992) (citation omitted). Where the proposed claim could not withstand a Fed. R.Civ.P. 12(b)(6) motion to dismiss, amendment should not be permitted. *See Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041 (6th Cir.1991) (citation omitted).

The first claim Plaintiffs seek to add asserts two separate violations of the TILA. In the first part of their claim, Count III of the proposed third amended complaint, Plaintiffs allege that CommonPoint violated 15 U.S.C. § 1638(a)(2)(A)(ii) by failing to include the document preparation fee in the "amount financed" section of the TILA disclosure. The TILA requires a creditor to disclose the "amount financed" to the consumer in a credit transaction. *See* 15 U.S.C. § 1638(a)(2)(A). The "amount financed" includes "any charges which are not part of the finance charge or of the principal amount of the loan and which are financed by the consumer, including the cost of any items excluded from the finance charge pursuant to section 106." 15 U.S.C. § 1638(a)(2)(A)(ii). Charges excluded from the finance charge include "[f]ees for preparation of loan-related documents." 15 U.S.C. § 1605(e)(2). Plaintiffs allege that CommonPoint violated the TILA because it included the document preparation fee in the "finance charge" section rather than the "amount financed" section of the disclosure. (*See* Pls.' Br. Mot. Leave at 3–4.)

■ Plaintiffs' claim is not actionable under the TILA even if their allegations are true and CommonPoint was required to disclose the document preparation fee as part of the "amount financed." Under 15 U.S.C. § 1605(f)(1), which was added to the TILA as part of the Truth In Lending Act Amendments of 1995, Pub.L. No. 194–29, creditors are relieved of liability if an erroneous finance charge disclosure meets certain conditions. Section 1605(f)(1)(B) provides:

**(f) Tolerances for accuracy.** In connection with credit transactions not under an open end credit plan that are secured by real property or a dwelling, the disclosure of the finance charge and other disclosures affected by any finance charge -

(1) shall be treated as being accurate for purposes of this title if the amount disclosed as the finance charge -

\*　　\*　　\*　　\*　　\*　　\*

(B) is greater than the amount required to be disclosed under this title.

15 U.S.C. § 1605(f)(1)(B). Under the tolerance rule stated in § 1605(f)(1)(B), the fi-

nance charge and all disclosures affected by the finance charge are deemed accurate if the disclosure error produces a finance charge which exceeds the actual finance charge.[7] The amount financed disclosure is a disclosure "affected by [the] finance charge" because an amount not included in the finance charge must be included in the amount financed disclosure. The Federal Reserve Board's revisions to Regulation Z incorporating the 1995 Amendments explain the application of the § 1605(f)(1)(B) tolerance as follows:

> (1) *Mortgage loans.* In a transaction secured by real property or a dwelling, the disclosed finance charge and other disclosures affected by the disclosed finance charge (*including the amount financed and the annual percentage rate* ) shall be treated as accurate if the amount disclosed as the finance charge:

> \* \* \* \* \* \*

> (ii) Is greater than the amount required to be disclosed.

12 C.F.R. § 226.18(d) (1998)(emphasis added); *see also* Rules & Regulations, Federal Reserve System, 61 Fed.Reg. 49,237, 49,242 (1996)("[T]he amendments create a tolerance for the finance charge disclosed for mortgage loans as well as 'any disclosure affected by the finance charge.' Consumer groups argued the Congress intended the new tolerances to apply only to numerical disclosures other than the APR (such as the 'amount financed' and the 'total of payments'), for which there is currently no regulatory or statutory tolerance. The Board believes, however, that the APR is one of the 'affected disclosures.' Otherwise, transactions in which the disclosed finance charge is misstated but considered accurate under the new tolerance would remain subject to legal challenge based on the disclosed APR, which seems inconsistent with the legislative intent").

Plaintiffs contend that applying § 1605(f)(1)(B) to preclude liability for disclosing a document preparation fee under the finance charge rather than the amount financed "would render § 1638(a)(2)(A)(ii) surplusage, because every time a lender ignores its duty to correctly disclose the amount financed by putting amounts financed in the wrong box, it results in an incidental overstatement of the finance charge." (Pls.' Reply Supp. Mot. Amend at 10.) The Court finds no such conflict. Although § 1638(a)(2)(A) does require a creditor to make an accurate disclosure of the amount financed, § 1605(f)(1)(2) represents Congress' decision that an overstatement of the finance charge, while perhaps technically resulting in a TILA violation, should not result in liability for the creditor where the charge is mistakenly disclosed but results in overdisclosure of the finance charge.[8]

Plaintiffs also argue that applying § 1605(f)(1)(B) to allow CommonPoint to escape liability would be inconsistent with the legislative history of the 1995 Amendments. This argument fails because it is unnecessary to review the legislative history of the statute. Where the intent of Congress as expressed in unambiguous language of a statute is clear, a court need only apply the language of the statute without examining legislative history or agency interpretations.

---

**7.** *The tolerance in § 1605(f)(1)(A), which also* completely precludes liability under the TILA, applies where the disclosed finance charge "does not vary from the actual finance charge by more than $100." This tolerance applies to situations in which creditors mistakenly disclose a finance charge as part of the amount financed, as occurred in *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir.1994), the case which spawned the 1995 TILA amendments. The tolerances created in § 1605(f)(2) are specifically limited to actions for recission brought under § 1635.

**8.** Plaintiffs cite *Gibson v. Bob Watson Chevrolet-Geo, Inc.,* 112 F.3d 283 (7th Cir.1997) in support of their argument that inaccurate disclosure of the amount financed under § 1638(a)(2) results in an independent violation. *Gibson* does not support Plaintiffs' argument. In that case, the plaintiff alleged that the defendant violated the TILA by failing to disclose the difference between the cash price and the credit price of an automobile warranty as a finance charge and by failing to disclose that it was retaining part of a warranty fee shown in the amount financed itemization as being paid to a third party. *See* 112 F.3d at 284–85. In this case, Plaintiffs' claim is that CommonPoint failed to disclose the document preparation fee as the *amount financed* rather than as part of the *finance charge.* Moreover, the issue of tolerances was not raised in *Gibson.*

*Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); *Bridewell v. Cincinnati Reds,* 155 F.3d 828, 830 (6th Cir.1998)(holding that a court may not examine "legislative history to contravene the clear and unambiguous language of [a] statute"); *McKamey v. Roach,* 55 F.3d 1236, 1239 (6th Cir.1995)("Because the language of the statute is clear, we do not rely on the legislative history . . . in reaching our decision"). Nonetheless, as noted above, applying § 1605(f)(1)(B) to defeat Plaintiffs' proposed claim is consistent with the Federal Reserve Board's interpretation of the statute.

Moreover, the legislative history shows that as part of the 1995 Amendments, "due to its concern over how certain judicial decisions might impact the mortgage banking industry," Congress sought to limit creditors' TILA liability based upon mere "technical errors and ambiguity surrounding the proper characterization of charges." *O'Brien v. J.I. Kislak Mortgage Corp.,* 934 F.Supp. 1348, 1359 (S.D.Fla.1996). In fact, Congress enacted the 1995 Amendments primarily in response to the Eleventh Circuit's holding in *Rodash v. AIB Mortgage Co.,* 16 F.3d 1142 (11th Cir.1994). In *Rodash,* the court held that the defendant violated the TILA by including a $22 Federal Express charge and a $204 Florida intangible tax charge in the amount financed rather than the finance charge disclosure. Based upon the violations, the court allowed the plaintiff to rescind the mortgage loan.

The holding in *Rodash* spawned several class actions involving thousands of borrowers seeking the remedy of recission. Congress responded by adopting a moratorium on certain TILA cases, which was replaced by the 1995 Amendments. Although most of the bill's sponsors addressed their comments to the recission tolerances affected by the amendments, the comments of Representative McCollum are particularly enlightening with respect to the tolerance at issue. In discussing the tolerance portions of the bill, Mr. McCollum stated:

> [R]ecognizing the highly technical nature of the [TILA], the bill raises the tolerance level for understated disclosures, going

forward, from $10 to $100 for civil liability purposes. Regarding the tolerance related to the award of statutory damages under section 130 of the act, the finance charge will be considered accurate on a prospective basis if the disclosed amount is within $100 of the actual amount; the accuracy tolerance for civil liability on past transaction [sic] is set at $200. *Overstatements continue to be allowed without imposing liability.*

141 Cong. Rec. H9513–01 (daily ed. Sept. 27, 1995)(statement of Rep. McCollum)(emphasis added). Thus, Plaintiffs' proposed disclosure claim fails, even with the benefit of legislative history.

 In the second part of their TILA claim, Plaintiffs allege that CommonPoint violated § 1638(a)(2)(B)(ii) by failing to itemize the document preparation fee in the itemization of the amount financed as an amount "credited to the consumer's account to discharge obligations owed to the creditor." 15 U.S.C. § 1638(a)(2)(B)(ii). TILA requires a lender to provide a borrower a written "itemization of the amount financed" in closed end credit transactions, including: (i) "the amount that is or will be paid directly to the consumer"; (ii) "the amount that is or will be credited to the consumer's account to discharge obligations owed to the creditor"; (iii) "each amount that is or will be paid to third persons by the creditor on the consumer's behalf"; and (iv) "the total amount of" prepaid finance charges. 15 U.S.C. § 1638(a)(2)(B)(1)-(4); *see also* 12 C.F.R. § 226.18(c)(i)-(iv) (1998). The documents attached to Plaintiffs' proposed third amended complaint show that CommonPoint included the document preparation fee in the itemization of the amount financed, but showed the charge as a prepaid finance charge rather than an amount paid to the borrower's account, as Plaintiffs contend CommonPoint should have done. (*See, e.g.,* Itemization of Amount Financed (VanDenBroeck), attached to Pls.' Proposed 3d Am. Compl. as Ex. 1.)

CommonPoint contends that the plain terms of the statute require itemization of an amount as "credited to the consumer's account" only when a portion of the credit proceeds are to be used to pay part or all of

a preexisting debt which the consumer owes to the creditor. While the statute does not limit the term "account" to those existing at the time credit is extended, this reading is not inconsistent with the Official Staff Interpretations issued by the Division of Consumer and Community Affairs of the Federal Reserve Board, which state:

> 1. *Amounts credited to consumer's account.* The term *consumer's account* refers to an account in the nature of a debt with that creditor. It may include, for example, an unpaid balance on a prior loan, a credit sale balance or other amounts owing to that creditor. It does not include asset accounts of the consumer such as savings or checking accounts.

12 C.F.R. Pt. 226, Supp. I at 383 (1998); *see id.* at 382 ("[A]n amount paid on the consumer's account may be revised to specifically identify the account as 'your auto loan with us' ").

■ Plaintiffs contend that CommonPoint's analysis is flawed because neither the statute nor Regulation Z limit "the amount credited to the consumer's account" to antecedent debts. In addition, Plaintiffs argue that the issue of the proper itemization category is irrelevant, because CommonPoint violated the TILA by disclosing the document preparation fee in the wrong category—as a prepaid finance charge.[9] CommonPoint does not argue that the document preparation fee was correctly shown as a prepaid finance charge.

The Court finds it unnecessary to determine the proper category for itemization of the document preparation fee because the tolerance set forth in § 1605(f)(1)(B) bars Plaintiffs' itemization claim. As discussed above, that tolerance treats the finance charge and other "disclosures affected by any finance charge" as accurate if the amount disclosed as the finance charge exceeds the amount required to be disclosed. The written itemization of the "amount fi-

nanced" required by § 1638(a)(2)(B) is a "disclosure" affected by the finance charge because any charge included in the finance charge "paid by the consumer before or at the time of the consummation of the transaction, or ... withheld from the proceeds of credit" must be disclosed in the "amount financed" itemization as a prepaid finance charge. 15 U.S.C. § 1638(a)(2)(A)(iii), (B)(iv); *see* 12 C.F.R. § 226.18(c)(iv)(1998). Because the document preparation fee was paid by plaintiffs or with funds withheld from credit proceeds at the time the credit was extended, CommonPoint's treatment of the fee as a prepaid finance charge, even if erroneous, is not actionable under the TILA.

■ In concluding that Plaintiffs fail to state an itemization claim, the Court is mindful of the purpose of the TILA, which is "to ensure 'a meaningful disclosure of credit terms' to applicants for credit to alleviate the unequal bargaining power and sophistication between consumers and lenders." *Brodo v. Bankers Trust Co.,* 847 F.Supp. 353, 356 (E.D.Pa.1994)(mem.op.). This is not a case where the lender failed to disclose that it was retaining part of a fee shown in the itemization as being paid to a third party, *see Gibson v. Bob Watson Chevrolet–Geo, Inc.,* 112 F.3d 283 (7th Cir.1997)(holding that plaintiff stated TILA claim where written itemization showed entire amount of warranty fee as being paid to third party and dealer failed to disclose that it was retaining part of fee), nor do Plaintiffs claim that the amount shown as the document preparation fee was inaccurate, *see Cirone–Shadow v. Union Nissan of Waukegan,* 955 F.Supp. 938, 941 (N.D.Ill. 1997)(mem.op.). Rather, Plaintiffs' proposed claim arises under circumstances in which Congress expressly determined that lenders should not be held liable. Because Plaintiffs cannot state a claim, amendment would be futile.

---

**9.** Plaintiffs' argument that CommonPoint was required to itemize the document preparation fee as an "amount financed" instead of a "prepaid finance charge" is wrong as a matter of law, because prepaid finance charges are included in the items that must be itemized as the "amount financed" pursuant to § 1638(a)(2)(B). *See* 15

U.S.C. § 1638(a)(2)(B)(iv); 12 C.F.R. § 226.18(c)(iv). Thus, a charge which is properly included in the finance charge disclosure may also be included in the "amount financed" itemization if the charge is a prepaid finance charge. *See* 15 U.S.C. § 1638(a)(2)(A)(iii), (B)(iv).

With regard to Plaintiffs' request to remedy any defects in their present claims, the Court also finds no basis to grant Plaintiffs leave to file an amended complaint because amendment would be futile. *See Sinay,* 948 F.2d at 1041. As discussed above, the Court found that Plaintiffs' RICO and TILA claims both failed to state a claim upon which relief could be granted. The Court concluded that the RICO claim should be dismissed because Plaintiffs failed to allege sufficient facts showing the existence of an enterprise or Defendants' participation or conduct in the affairs of the alleged enterprise. Plaintiffs twice amended their complaint, the second time after conducting a substantial amount of discovery, without adding newly discovered facts to expound on their RICO claim. In their brief in response to Defendants' motion to dismiss, Plaintiffs offered to amend their complaint to plead more specific details regarding the structure of the enterprise but did not identify those details or explain how they would augment their claim. Moreover, when the Court raised its concerns at oral argument regarding the structure of the alleged enterprise, Plaintiffs' counsel did not identify any particular facts not alleged in the second amended complaint that would have provided additional relevant support for their association-in-fact theory. Therefore, Plaintiffs have not demonstrated that an amendment would cure the pleading deficiencies in their RICO claim.

With regard to the TILA claim, the Court concluded that the claim failed as a matter of law. In other words, Plaintiffs could not allege additional facts that would save the claim from dismissal.

## II. State Law Claims

Plaintiffs' state law claims will be dismissed pursuant to 28 U.S .C. § 1367(c)(3). *See Brannon v. Boatmen's Bancshares, Inc.,* 952 F.Supp. 1478, 1487–88 (W.D.Okl.1997)(mem.op.)(dismissing plaintiffs' state law claims pursuant to § 1367(c) after dismissing RICO claim which was "sole basis" of federal jurisdiction). "A district court has broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims." *Musson Theatrical, Inc.*

*v. Federal Express Corp.,* 89 F.3d 1244, 1254 (6th Cir.1996)(citing *Transcontinental Leasing, Inc. v. Michigan Nat'l Bank,* 738 F.2d 163, 166 (6th Cir.1984)). Further, the Sixth Circuit has said that "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Musson,* 89 F.3d at 1254–55; *see also Eubanks v. Gerwen,* 40 F.3d 1157, 1161–62 (11th Cir.1994)(stating that when only state law claims remain, a federal court should decline jurisdiction by dismissing the case without prejudice)(quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988)(omitting footnote)). Given the status of the case, the Court finds no compelling reason to deviate from the general rule by retaining jurisdiction over Plaintiffs' state law claims.

### *Conclusion*

For the foregoing reasons, the Court will grant Defendants' Rule 12(b)(6) motion to dismiss Counts II and IV of the second amended complaint and dismiss Plaintiffs' state law claims without prejudice pursuant to 28 U.S.C. § 1367(c)(3). The Court will also deny Plaintiffs' motion for leave to file third amended complaint

An Order consistent with this Opinion will be entered.